52 A.3d 1251

David **THIERFELDER** and Joanne Thierfelder, H/W

v.

Irwin **WOLFERT**, M.D. and Medical Center at Gwynedd and Abington Memorial Hospital.

Appeal of Irwin Wolfert, M.D.

Supreme Court of Pennsylvania.

Argued March 10, 2010.

Decided Sept. 28, 2012.

John J. Hare, Kimberly A. Boyer–Cohen, Marshall, Dennehey, Warner, Coleman & Goggin, P.C., Philadelphia, for Irwin Wolfert.

Barbara S. Magen, Donald N. Camhi, Teresa Ficken Sachs, Post & Schell, P.C., Philadelphia, for Medical Center at Gwynedd and Abington Memorial Hospital.

Bruce Gerald Cassidy, Philadelphia, Michael W. Landis, Bruce G. Cassidy & Associates, P.A., Trevose, for David and Joanne Thierfelder.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Chief Justice CASTILLE.

The question presented in this case is one of first impression for this Court: whether a medical general practitioner who provides incidental mental health treatment to a patient, with whom he then engages in a sexual affair, may be held to a particularized "specialist duty," applicable to mental health professionals, that prohibits consensual sexual contact with patients, such that the defendant general practitioner may be subject to medical malpractice liability in tort. For the following reasons, we decline to impose such a duty as a matter of Pennsylvania common law. Accordingly, we vacate and remand to the Superior Court for further disposition consistent with this Opinion, including consideration of whether any preserved issues remain that were not addressed as a result of the Superior Court's disposition.

■ This appeal arises from an order sustaining preliminary objections. In our review, we accept as true all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts. *Stilp v. Commonwealth*, 596 Pa. 62, 940 A.2d 1227, 1232 n. 9 (2007).

David Thierfelder ("appellee-husband") began receiving treatment from Irwin Wolfert, M.D. ("appellant"), a family

practitioner, in October 1996. Mr. Thierfelder's wife Joanne Thierfelder ("appellee-wife") began treating with appellant about a month later. Both appellees saw appellant for several years, during which time appellant treated both for, *inter alia*, libido problems. Appellant's treatment of appellee-wife addressed various physical ailments but also symptoms of depression, anxiety, stress, attention deficit disorder, and other emotional problems. Eventually, appellee-wife came to believe that appellant had "cured" her problems; she told him that he was her "hero" and that she believed she was in love with him. In the spring of 2002, the two began a sexual relationship that persisted for almost one year. The encounters took place at the Medical Center at Gwynedd where appellant maintained an office, in an automobile, and at appellant's parents' residence. Appellee-wife became increasingly anxious and depressed; at one point, she attempted to break off the relationship, but appellant convinced her to continue until she finally ended the affair in January 2003.

In March 2003, appellee-wife told her husband about the sexual affair. In July, appellees together filed suit, along with a certificate of merit, naming as defendants appellant, the Medical Center at Gwynedd, and Abington Memorial Hospital.[1] Appellees' initial complaint alleged the following: During the course of appellant's treatment of appellee-wife for depression and anxiety, appellee-wife expressed that she believed she was in love with him; the two thereafter began a sexual relationship, during which appellee-wife became increasingly anxious and depressed; and as the affair continued, appellee-wife became obsessive and dependent on appellant before finally ending the relationship and telling her husband. The complaint further alleged that appellant was reckless, negligent, and careless and deviated from the "standard of care for physicians under the circumstances" by: instituting and continuing a sexual relationship with his patient; failing to end the sexual relationship; failing to insist that appellee-wife find another physician to treat her for her medical and men-

1. The institutional defendants have been dismissed and are not parties to this appeal; appellant is the sole remaining defendant.

tal/emotional problems; placing his own physical needs and desires before the psychological welfare of his patients; misusing confidential information given to him by both appellees; violating the fiduciary duty he owed to appellees; interfering with appellees' marriage; and violating the standards of ethics for physicians. The complaint asserted that as a result of appellant's conduct, appellee-wife suffered deterioration of her psychological condition, severe depression, mental anguish, physical pain, emotional damage and harm, and loss of the opportunity to obtain relief from her psychological condition. Appellees also asserted both intentional and negligent infliction of emotional distress and willful, wanton, and reckless conduct on appellant's part; appellees sought "exemplary damages" of five million dollars. Complaint, 7/2/03.

Appellees filed an amended complaint shortly thereafter, which contained no substantive changes, but separated the allegations in the original complaint into four untitled, enumerated sections. Amended Complaint, 8/7/03. Appellant responded by filing preliminary objections asserting that appellees had failed to state causes of action for negligent and intentional infliction of emotional distress; willfulness, wantonness, and recklessness; tortious interference with a marital contract; breach of fiduciary duty; and breach of physician-patient confidentiality. Appellant also argued that appellees failed to state a cause of action for medical negligence because their allegations stated only that the sexual relationship arose after appellant's "rendition of medical care" to appellee-wife, as demonstrated by her statement that appellant had "cured" her; according to appellant, a cause of action for medical negligence must assert sufficient facts that the harm claimed arose "from" (and not "after") the rendition of medical care. Appellant's Preliminary Objections, 8/26/03.

Next, appellees filed a second amended complaint, which provided titles for the enumerated sections; relevant to this appeal, the first two sections were now titled "Negligence" and "Medical Malpractice." In the "Negligence" section, appellees repeated their original allegations to the effect that appellant was reckless, negligent, and careless and deviated from the

"standard of care for physicians under the circumstances" by: instituting and continuing a sexual relationship with his patient; failing to end the sexual relationship; failing to insist that appellee-wife find another physician to treat her; placing his own physical needs and desires before the psychological welfare of his patients; misusing confidential information; violating a fiduciary duty; interfering with appellees' marriage; and violating the standards of ethics for physicians. The complaint asserted that as a result of appellant's conduct, appellee-wife suffered deterioration of her psychological condition, severe depression, mental anguish, physical pain, emotional damage and harm, and loss of the opportunity to obtain relief from her psychological condition. The "Medical Malpractice" section of the second amended complaint pertained to appellee-wife only, and alleged that appellant "deviated from the standard of care for physicians under the circumstances" by: misusing drugs during the course of her treatment, breaching patient confidentiality, failing to treat her appropriately, practicing therapeutic techniques beyond the scope of his competence, terminating her treatment without appropriate follow-up or referral, failing to warn her that "certain treatment has been harmful," failing to properly recognize, diagnose, and treat the "transference" that befell her,[2] and failing to timely refer her to another physician. Second Amended Complaint, 9/17/03.

Appellant responded with additional preliminary objections reiterating that his sexual relationship with appellee-wife "commenced outside of the course and scope of the rendering of medical services," and thus, appellees had not established a cause of action for either ordinary or medical negligence. Appellant also referred to a recent trial court decision in which the Honorable Sandra Mazer Moss of the Court of Common Pleas of Philadelphia County held that, lacking a

---

**2.** Transference, which will be discussed at length *infra,* has been described as: "[t]he process whereby the patient displaces onto the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly." *St. Paul Fire & Marine Ins. v. Love,* 459 N.W.2d 698, 700 (Minn.1990) (quoting S. Waldron–Skinner, A Dictionary of Psychotherapy 364 (1986)).

mental health therapist-patient relationship, sexual relations between a physician and a patient's estranged wife did not constitute medical malpractice. Appellant's Preliminary Objections to Second Amended Complaint, 10/15/03 (citing *Long v. Ostroff*, 63 Pa. D. & C. 4th 444 (Pa.Com.Pl.2003)). Appellees answered the preliminary objections, stating that their certificate of merit expressed that appellant's conduct departed from acceptable medical standards and was the cause of appellees' harm; appellees also argued that contrary to appellant's assertions, a mental health therapist-patient relationship did arise and develop between appellant and appellee-wife. Appellees' Answer to Appellant's Preliminary Objections, 10/31/03. The court overruled appellant's preliminary objections, but ordered appellees to file another amended complaint pleading their asserted material facts with greater specificity. Trial Ct. Order, 1/16/04.

Appellees filed a third and final amended complaint in February 2004. In the section titled "Negligence," appellees set forth a detailed account of the manner in which the affair between appellant and appellee-wife began and how appellee-wife grew increasingly more anxiety-ridden, obsessive, and dependent as the relationship progressed. Appellees also alleged that appellant made attempts to convince appellee-wife to continue the relationship when she attempted to end it. Appellees also added allegations that appellant made certain statements to appellee-wife that worsened her already fragile emotional state over the affair. In the "Medical Malpractice" section, appellees listed the same allegations set forth in the previous complaint. Third Amended Complaint, 2/4/04.

In his answer, appellant generally denied appellees' allegations and specifically denied that he (or his conduct) was the direct or proximate cause of appellees' alleged injuries. Answer [of Appellant] to [Appellees'] Third Amended Complaint with New Matter, 2/9/04, at 2–4. At this point, due to an evident technical error in filing the original complaint, which was docketed with No. 03–11978, appellees re-filed an identical action later in February 2004; this action was docketed with No. 04–03111.

In March 2004, appellant filed preliminary objections in the 04–03111 matter asserting, *inter alia*, that appellees' complaint failed to state a cause of action for either ordinary negligence or medical malpractice. Appellant argued that appellees' complaint did not set forth the requisite factual basis to prove that his rendition of professional medical services to appellees caused them cognizable injury or was an "unwarranted departure from generally accepted standards of medical care." Moreover, according to appellant, "the alleged sexual conduct at issue can't possibly constitute medical malpractice under Pennsylvania law where the therapist-patient relationship is lacking." Appellant cited Judge Moss's decision in *Long v. Ostroff* for the proposition that, in the absence of a therapist-patient relationship, a family physician's sexual conduct with a patient's wife did not constitute medical malpractice under Pennsylvania law. As for appellees' allegations sounding in ordinary negligence, appellant countered that "the mere happening of a consensual sexual relationship between adults, outside of the context of marriage," did not give rise to a duty of care in either participant to the other participant "with respect to the commencement, happening of or termination" of the relationship. Appellant's Preliminary Objections and Memorandum in Support, 3/15/04, at 6.

The trial court initially overruled the preliminary objections and litigation proceeded, but in June 2004, the Superior Court affirmed Judge Moss's disposition in *Long. Long v. Ostroff*, 854 A.2d 524 (Pa.Super.2004). Based on that decision, appellant sought reconsideration of the trial court's decision to overrule his preliminary objections.

In *Long*, a general practitioner who treated both the plaintiff and the plaintiff's wife engaged in a sexual affair with the wife, which the doctor did not disclose to the plaintiff, even when the plaintiff complained of anxiety due to marital problems and sought a referral to a mental health professional. The plaintiff sued, alleging medical malpractice. The doctor filed a motion for summary judgment, which was denied, and then a motion to dismiss, which was granted, and the patient appealed.

The *Long* Superior Court panel construed the trial court's grant of the defendant's motion to dismiss as a grant of summary judgment and noted that the "novel" legal issue presented was whether a claim for medical malpractice is cognizable, as a matter of law, premised upon a physician having an affair with his patient's wife. The panel concluded that a general practitioner's duty of care does not prohibit an extramarital affair with a patient's spouse. In so holding, the panel noted that, in arguing that the doctor owed him a duty of care not to engage in a sexual relationship with his wife, the plaintiff relied "solely and heavily" upon a North Carolina case, *Mazza v. Huffaker*, 61 N.C.App. 170, 300 S.E.2d 833 (1983). The panel noted that *Mazza* was not binding in Pennsylvania and that, in any event, it was distinguishable on two grounds. First, the panel distinguished *Mazza* because it spoke to a supposed "special duty" owed by psychiatrists to their patients, which the panel said "does not extend to general practitioners." Second, the *Long* panel noted that *Mazza* had to be understood in light of peculiarities then existing in North Carolina tort law (involving recognized torts for criminal conversation and alienation of affection), whereas Pennsylvania had abolished such tort claims. *Long*, 854 A.2d at 528. This Court denied allocatur. *Long v. Ostroff*, 582 Pa. 700, 871 A.2d 192 (2005).

In his motion to reconsider, appellant herein relied upon *Long*'s discussion of *Mazza* to argue that, because he was a general practitioner and not a mental health professional, no "therapist-patient relationship" arose between himself and appellee-wife that could trigger a mental health specialist's duty to avoid a sexual relationship. Thus, appellant argued, appellees' medical malpractice allegations were legally unsustainable. Appellant pointed particularly to the *Long* opinion's distinction between unethical and tortious conduct by a medical professional: "Simply put, unethical conduct does not provide the foundation for a cause of action sounding in medical negligence." Appellant's Memorandum of Law in Support of Motion to Reconsider, 12/30/04, at 3. Appellant emphasized that appellees "have not alleged that [appellant's]

medical diagnoses of [appellees] were in any way negligent," and also that the consensual sexual relationship between himself and appellee-wife was not connected to the manner in which he rendered professional medical care. *Id.* at 5–6.

Appellees responded that *Long* should be limited to its facts and read narrowly as holding only that a doctor has no duty to disclose a sexual relationship with a patient's spouse to the patient, even if both spouses are patients of the doctor. According to appellees, *Long* should not be read as supporting the premise that a patient may not pursue a cause of action in malpractice against a medical doctor if the doctor (a non-mental health professional) has sexual contact with the patient. Appellees also asserted factual distinctions. Appellees' Answer to Motion to Reconsider, 1/20/05, at 1–2, 4.

The trial court granted reconsideration in January 2005; after oral arguments focusing on *Long*, the court vacated its previous order, sustained in part appellant's preliminary objections, and dismissed with prejudice appellees' claims of negligence, medical malpractice, fraudulent misrepresentation, negligent infliction of emotional distress, willful, wanton, and reckless behavior, and loss of consortium. Trial Ct. Order, 5/5/05.[3]

Appellees' appeal of the May 5, 2005 reconsideration order was quashed by the Superior Court as interlocutory in August 2005. After subsequent litigation and discovery, including consolidation with a previously separate, parallel matter, appellees stipulated to dismiss their claims for battery and intentional infliction of emotional distress, a stipulation the trial court approved. The stipulation allowed appellees to appeal the trial court's now-final dismissal of their remaining claims, primarily appellee-wife's claims based on allegations of ordinary negligence, negligent infliction of emotional distress, medical malpractice, fraudulent misrepresentation, and willful,

3. This appeal presents a specific question concerning appellees' professional negligence/medical malpractice claim alone. As will be discussed *infra,* it is not clear from the record and presentations before us which, if any, of appellees' various other claims remain preserved and require further action by the Superior Court.

wanton, and reckless behavior; and appellee-husband's derivative loss of consortium claim.[4] Appellees subsequently perfected their appeal to the Superior Court and the trial court issued a Pa.R.A.P. 1925(a) opinion.

In its opinion, the trial court asserted that it had not erred in sustaining appellant's preliminary objections and dismissing appellees' claims of ordinary negligence, negligent infliction of emotional distress, and medical malpractice. The court emphasized *Long*'s distinction of the *Mazza* case on the ground that it involved the duty of a psychiatrist, and not that of a general practitioner. The trial court stated that even though appellee-wife here was herself a patient and not just a patient's spouse, as in *Long*, the reasoning in *Long* nonetheless "can be applied to the patient that consented to the sexual relationship" with the doctor. The trial court concluded that appellant's conduct may have been unethical, but "it [was] not a breach of the duty of care when a general practitioner engages in a sexual relationship with a patient." Trial Ct. Op., 5/4/07, at 7. The trial court did not articulate any substantive distinction between appellees' medical malpractice claim, to which a discussion of *Long* was more directly relevant, and appellees' additional remaining claims sounding primarily in allegations of ordinary negligence or professional negligence aside from the instance of the sexual relationship between appellant and appellee-wife.

On appeal to the Superior Court, appellees raised five issues, all pertaining to the trial court's dismissal of their medical malpractice claim:

> I—Did the court below err in dismissing Appellants' medical malpractice action on the pleadings, while disregarding Appellants' uncontradicted expert medical testimony that described Appellee's duty, breach of that duty and deviation from the standard of care in instituting a sexual relationship with Appellant wife during the physician-patient relationship?

---

4. The trial court dismissed appellee-husband's direct claims and appellees do not challenge that disposition.

II—Did the court below err in determining that *Long v. Ostroff*, 2004 Pa.Super. 240 [854 A.2d 524], cert. denied 582 Pa. 700 [871 A.2d 192] (2005), barred wife Appellant's claim against Appellee, as a matter of law, when Appellee instituted a sexual liaison with wife Appellant while Appellee was her treating physician, when that issue was never before the Court in *Long?*

III—Must this Honorable Court grant great deference to the findings and opinions of the Commonwealth of Pennsylvania Bureau of Professional and Occupational Affairs and the Commonwealth Court of Pennsylvania which have ruled that physicians committed unprofessional conduct and deviated from the standard of practice by engaging in a sexual relationship with a patient?

IV—Did the court below err in dismissing Appellant wife's medical malpractice action against Appellee without first conducting the analysis required by *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000)?

V—Should this Honorable Court reconsider its decision in *Long v. Ostroff* in light of the *Althaus v. Cohen* analysis, and allow Appellant husband's action to proceed?

Appellees' Brief to Superior Court at 3. As phrased by appellees, the "essence" of the appeal was that the trial court "improperly deprived [appellees], especially [appellee-wife], of the opportunity to develop a cause of action for medical malpractice against [appellant] arising out of [appellant's] institution of a sexual relationship during [appellant's] medical treatment of [appellee-wife] for, *inter alia,* depression and anxiety arising from her marital relationship, while [appellant] was prescribing antidepressant medication for [appellee-wife]." *Id.* at 8. In response, appellant argued that his consensual sexual relationship with appellee-wife outside the scope of the medical care he provided simply could not support an action in medical malpractice. Appellant added that although the dismissal of most of appellees' other claims was either via stipulation or not appealed, rejection of appellee-wife's malpractice claims against him would still leave a resid-

ual ordinary negligence claim.[5]   Appellant also assailed appellees' "continued reliance" on their expert's opinion as irrelevant to the threshold legal question of whether a legal duty exists respecting the medical malpractice claim.   Appellant's Brief to Superior Court at 9–12.

A divided three judge panel of the Superior Court affirmed in an unpublished decision.[6]   The lead memorandum found that appellant's actions did not implicate medical treatment so as to establish a *prima facie* case of professional negligence. The memorandum cited *Physicians Insurance Co. v. Pistone*, 555 Pa. 616, 726 A.2d 339 (1999), for the proposition that a viable claim of medical negligence requires that the malpractice occur in the course of the defendant's provision of actual medical care or services.[7]   The memorandum concluded that there was no allegation in appellees' pleadings that appellant's sexual contact with appellee-wife was presented or accepted as part of a course of medical care, and thus appellees had not established a *prima facie* case of medical malpractice.   Super. Ct. Op., 8/6/08, at 4–9.

In dissent, Judge Klein opined that, although appellant was a general practitioner, he had been treating appellee-wife for psychological and emotional problems when the sexual relationship began.   In Judge Klein's view, appellant was aware of

5. The Superior Court did not separately address appellees' claims sounding in ordinary negligence and it is unclear whether those claims were preserved for consideration on appeal.   Our remand includes instructions that the Superior Court determine whether any such claims properly remain.

6. The panel included Judges Klein, Gantman, and Kelly.   Judge Gantman concurred in the result and Judge Klein filed a dissenting memorandum.

7. In *Pistone*, the plaintiff was being treated at a hospital for gallstones when Dr. Pistone, one of her treating doctors, entered her room, closed the privacy curtain around the bed, and then fondled the plaintiff's breasts, exposed his genitals to her, and masturbated in front of her. When the plaintiff sued, the doctor's professional liability insurer denied coverage and refused to defend or indemnify him.   This Court held that *in the insurance context, covered "professional health care services"* were limited to actions involving "a medical skill associated with medical training," and the doctor's actions with regard to the plaintiff were not so associated.   726 A.2d at 344.   Accordingly, the insurer was not bound to indemnify or defend the doctor.

appellee-wife's vulnerability and should have known that sexual involvement with her carried a foreseeable and unreasonable risk of increased or enhanced mental and emotional difficulties arising directly from the affair itself. Judge Klein added that because general practitioners now often provide some degree of mental or emotional care for their patients, including prescription of medications (which does not appear to be in dispute), there is no longer a basis for maintaining a distinction between general practitioners and mental health professionals in a case like this.

The Superior Court granted reargument *en banc*, withdrew the original panel decision, and, in a new 6 to 3 decision, reversed the trial court's decision, and remanded. *Thierfelder v. Wolfert*, 978 A.2d 361 (Pa.Super.2009) (*en banc*). The majority opinion by Judge Klein held that "a patient does have a cause of action against either a psychiatrist or a general practitioner rendering psychological care, when during the course of treatment the physician has a sexual relationship with the patient that causes the patient's emotional or psychological symptoms to worsen." *Id.* at 364. Analytically, the majority quoted the factors this Court articulated in *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166, 1169 (2000), which govern common law determinations of tort duty; these will be discussed at length *infra.* The majority noted that healthcare providers "serve[ ] a legitimate public interest," but then opined that, given the doctor's superior knowledge and experience, "the players are on unequal playing fields, [and thus] it is even more incumbent upon our legal system to protect patients from malfeasance of medical professionals when they become sexually involved with their trusting patients." *Thierfelder*, 978 A.2d at 366. The majority distinguished *Long* because appellee-wife in this case was the actual patient involved in the sexual relationship and was receiving some degree of care from appellant for mental and emotional issues and was not, as in *Long*, the patient's spouse. In the majority's view, the "risk of foreseeable harm is much greater in cases where the plaintiff is the actual person with whom the doctor is having an affair." *Id.* at 367.

Finally, in a subsection of the opinion entitled "General Practitioner versus Specialists," the majority stated: "we believe that there is no reason to distinguish general practitioners from psychiatrists when those general practitioners are treating their patients' psychological problems/conditions. In both cases the physicians need to maintain the same trust *when rendering psychological care." Id.* at 367–68 (emphasis in original). The majority then concluded its duty analysis as follows:

[A]s it is alleged that Dr. Wolfert, a general practitioner, was rendering psychological care, it does not matter that he is not a specialized psychiatrist or psychologist. It is not appropriate to make a distinction between the two classes of physicians when they are rendering the same care. The risk of harm is different when a physician is rendering psychological care rather than treating for some other symptom. If [appellee-wife] had simply alleged that she had been treated by Dr. Wolfert for a non-emotional condition such as arthritis, we might not find that [appellee-wife] would have a viable cause of action against him. It well could be that under those circumstances a subsequent, intervening sexual relationship would have had no effect on her arthritic condition-thus establishing no causal connection for malpractice.

However, in this case, it has been pled that [appellee-wife] was being treated for emotional and psychological vulnerabilities. The allegation that the sexual relationship between her and her doctor intensified the nature of her condition compels our result today.

*Id.* at 368 (citations omitted). The majority pointed out in a footnote that appellees had also raised claims sounding in negligence, negligent infliction of emotional distress, fraudulent misrepresentation, and willful, wanton, and reckless behavior. However, the court did not further address the status of these remaining claims sounding in various theories of ordinary negligence. *See id.* at 363 n. 3, 365 n. 8.

Judge Lally–Green filed a dissenting opinion joined by then-Judge Orie Melvin and Judge Shogan. The dissent noted that

the Superior Court should be reluctant to expand tort liability in the absence of clear guidance from either this Court or the General Assembly. The dissent predicted that, based on *Pistone,* in which this Court adopted what the dissent described as a "narrow test" for determining which underlying actions by a physician might trigger malpractice insurance coverage, this Court would likely decline to recognize potential liability in this case. In the dissent's view, appellees' allegations did not satisfy the standard implied by *Pistone* because there was no claim that appellant proposed sexual relations as part of his treatment of appellee-wife. Rather, the relationship was more accurately characterized as "a consensual, nonmedical sexual affair between a doctor and a patient" that "does not constitute the rendering of a 'medical skill associated with specialized training.'" *Id.* at 369. The dissent considered appellant's conduct to be unethical, but not actionable as medical malpractice. Finally, the dissent noted that while it did not dispute the majority's reliance upon traditional common law principles, such as the *Althaus* factors, courts should heed the reality that medical malpractice is increasingly the province of specialized rules and regulations set forth by both the General Assembly and by this Court. *Id.* at 370 n. 2.

This Court granted appellant's petition for allowance of appeal, limited to a single issue respecting duty, which we rephrased as follows:

Whether, for purposes of determining professional negligence, a general practitioner who provides mental health treatment to a patient is held to the same higher duty as a specialist in psychiatry or psychology?

603 Pa. 430, 984 A.2d 935 (2009). This is a pure question of law; thus our scope of review is plenary and our standard of review is *de novo. Castellani v. Scranton Times, L.P.,* 598 Pa. 283, 956 A.2d 937, 943 (2008).

Appellant argues that the "well-established" distinction between the duty owed to patients by general practitioners and the particularized duty owed by mental health professionals should be maintained in this case. Thus, the mere fact that

appellee-wife alleges that appellant treated her for psychological problems is no basis to apply a standard of medical care applicable to mental health specialists. Appellant also posits that the Superior Court majority failed to apprehend "the import of the transference phenomenon." Appellant describes the transference phenomenon as a process recognized in specialized mental health treatment wherein the patient displaces onto the therapist various feelings, attitudes, and attributes that properly belong to a significant attachment figure from the patient's past, usually a parent, and the patient responds to the therapist accordingly. Citing cases from Minnesota, New York, and North Carolina, appellant stresses that transference is central to the patient-psychotherapist relationship, and in fact is an expected and accepted part of treatment for which mental health professionals receive particular training; and it is for that reason that some courts have held that a mental health professional's sexual relationship with a patient may be actionable as medical malpractice.

Citing cases from Washington, Massachusetts, Nebraska, and Minnesota, appellant argues that transference is not a component of the general practitioner-patient relationship and that courts have been disinclined to impose professional liability premised upon a consensual sexual relationship between a general practitioner and a patient. Appellant cites *Long* for the proposition that the Superior Court has also declined to extend the heightened "burdensome duty" borne by mental health professionals to general practitioners, and *Pistone* for the proposition that this Court has at least recognized transference as a unique component of specialized mental health services.[8] Appellant claims that to erase the distinction be-

8. The *Pistone* Court, in *dicta*, referenced transference when describing various types of tests used by courts in other states to determine whether a physician's sexual conduct with a patient may be covered by malpractice insurance. In a footnote describing one particular test, *Pistone* cited several cases where mental health professionals who engaged in sexual activity with patients were found to be covered because the "transference phenomenon, which sets the stage for the improper relationship between therapist and patient, is the result of the treatment itself" and therefore falls within the scope of those mental health specialists' professional liability coverage. 726 A.2d at 342 n. 3.

tween general practitioners, who merely prescribe medications or offer "some tangential support" respecting a patient's emotional or mental health issues, and mental health professionals, who provide a "course of treatment predicated on handling the transference phenomenon" and for whom a heightened duty is appropriate, would be unfair.

Appellant adds that holding general practitioners to a mental health specialist's duty of care standard simply because they are often "the first stop" in a patient's medical care runs counter to well-established tort law constructs and also to the reality that managed healthcare today often requires a patient to see a general practitioner before specialized care can be obtained or referrals made: "[A] general practitioner often has no choice but to be the threshold contact in treating any condition, including complaints of depression or anxiety."  Appellant's Brief at 18.

Appellant further asserts that this case is a particularly unsuitable vehicle for enlarging the potential liability faced by general practitioners because appellees' allegations regarding the mental health treatment he provided were particularly thin.  Appellant notes that appellees' complaint offers great detail as to the nature and occurrence of the sexual encounters, but contains only a "single, passing suggestion," devoid of detail, positing that appellant was treating appellee-wife for depression and anxiety. Appellant adds that the expert report appended to appellees' complaint indicates only that appellant prescribed antidepressants to appellee-wife and referred her to outside mental health counseling during a few visits that occurred during an isolated period of time long before their consensual sexual relationship began in the spring of 2002.

In response, appellees argue that overwhelming medical and judicial authority considers any and all sexual contact between physicians and patients to be both unethical and a basis for medical malpractice liability because, in certain circumstances, the sexual contact results from the course of treatment and from the physician's misunderstanding or misuse of the appro-

But that particular approach was ultimately rejected by the *Pistone* majority.  *Id.* at 344.

priate treatment method, which results in harm to the patient. Appellees assert that this most frequently occurs when a physician fails to properly manage transference. Citing cases from Oklahoma, the District of Columbia, and Nevada, appellees posit that liability may be imposed in such instances and that it is irrelevant whether the physician is a mental health professional or a general practitioner. Appellees note that the basis for their theory is that sexual contact between a physician providing mental health care and the patient receiving that care is directly related to the mental or emotional treatment involved (as opposed to a simply physical condition) and it may be expected that the sexual contact will exacerbate the patient's vulnerable mental and emotional condition and therefore cause him or her further harm.

In their brief, appellees also point to significant recent increases in the number of general practitioners who treat patients for mental and emotional conditions. Appellees cite their expert's reference to a study published in the New England Journal of Medicine in 2000, which concluded that general practitioners were at that time providing more than seventy-five percent of mental health therapy for depression. In appellees' view, this new reality should mandate that the mental health professional's duty to avoid sexual contact with patients should be imposed on all medical providers who render mental health care, regardless of specialty. Thus, when appellant "assumed the role of a therapist," "he became subject to the same duty of care owed by all other mental health professionals to their patients to refrain from having sex with them." Appellees' Brief at 11–16.

Appellees also assert that their theory is consonant with this Court's supposed recognition that "the transference phenomenon, which sets the stage for the improper relationship between therapist and patient, is the result of the treatment itself." *Id.* at 17 (quoting discussion in *Pistone* of other cases). Appellees claim that their allegations "exactly fit[ ]" what they call "the *Pistone* standard of professional negligence": appellant was treating and medicating appellee-wife for ˙depression and anxiety; she exhibited classic signs of

transference during the treatment; when she manifested transference by expressing her feelings to appellant, the sexual relationship commenced; and appellant maintained the relationship even as his patient's emotional health deteriorated. Appellees argue that appellant failed to properly recognize, diagnose, and treat appellee-wife's transference. Appellees assert that appellant should have treated appellee-wife appropriately or, at least, declined to practice "therapeutic techniques beyond the scope of his competence" and referred her directly to a trained psychotherapist. These failures on appellant's part, appellees claim, led directly to appellee-wife's increased mental and emotional distress.

Appellees add that the cases from other jurisdictions cited by appellant are either mischaracterized or distinguishable; appellees proffer their own cases where general practitioners provided mental health services to patients, then engaged in sexual relationships with those patients, and were deemed subject to malpractice liability. To appellees, the fact that appellant did not hold himself out as a mental health professional is irrelevant because the determination of duty must focus on what appellant actually has done and how he conducted himself with his patient.

Respecting the *Althaus* factors, appellees assert that: (1) the increasingly common situation where general practitioners provide mental health care and treatment involves an unequal relationship requiring protection for vulnerable patients; (2) the social utility in general practitioners providing mental health treatment must be matched by ensuring strict boundaries against sexual contact with patients, which can harm patients and has no social utility; (3) the risk posed by such sexual activity is potentially devastating to the patient, and also highly foreseeable; (4) imposing a heightened duty on general practitioners in this context will protect physicians as well as patients, since physicians should be aware of the necessary boundaries and should seek additional training before addressing their patients' mental health issues; and (5) the overall public interest in protecting against doctors who harm patients through inappropriate sexual activity will be

served by holding general practitioners to the higher duty in these cases.

Appellees add that Pennsylvania's Medical Practice Act of 1985, 63 P.S. §§ 422.1–422.51a, does not support the concept of different duties for physicians who provide the same kind of care. Appellees read the Act to provide that while a doctor may practice or specialize in a field like psychiatry, neither board certification nor a residency is required to do so and there are virtually no limitations so long as the practitioner is licensed by the State Board of Medicine. But, appellees argue, all physicians who provide treatment to patients have a duty to render that care in an appropriate manner. Appellees suggest that imposing different duties for practitioners in different fields will force courts to usurp legislative functions by determining who is and who is not a mental health professional on an *ad hoc* basis.

In his reply brief, appellant critiques appellees' reliance on the transference phenomenon as an attempt to sidestep the reality that his sexual relationship with appellee-wife was consensual and that his tangential treatment of her mental and emotional issues lacked the purposeful use of transference such that imposition of a mental health professional's duty to avoid sexual contact might be warranted. Appellant argues that appellees' current argument that he, in some manner, "incorporated transference as a treatment component," is a vague and conclusory allegation that is not of record and which was adverted to only in a "single, passing reference" in the complaint.

■ We turn now to the claim before us. In the medical professional negligence context, we have noted that: "to establish a *prima facie* case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888,

891 (1990); *see also Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 981 A.2d 145, 154 (2009) (same). Ultimately, to prove duty and breach, the plaintiff must show "that the act of the physicians or hospital fell below the standard of care" owed to the plaintiff as a patient. *Brannan v. Lankenau Hosp.*, 490 Pa. 588, 417 A.2d 196, 199 (1980). This case hinges upon the first element of the proffered tort: whether a general practitioner who provides some degree of mental or emotional treatment to a patient should be subject to what has been posed as a mental health professional's "heightened" standard of care, which, it is further alleged, entails a specific and strict duty to avoid sexual relations with patients.[9]

■ The question of duty in tort is "a legal determination, assigned in the first instance to the trial court and subject to plenary appellate review." *Sharpe v. St. Luke's Hosp.*, 573 Pa. 90, 821 A.2d 1215, 1219 (2003). As the Superior Court recognized, this Court in *Althaus* explored the concept of legal duty in the context of a medical malpractice suit brought against a psychiatrist by a teenaged patient and her parents. The patient initially alleged that her father had sexually abused her, which led to an investigation and sexual abuse charges against both parents that were eventually dismissed when it became clear that the patient had been delusional. The parents' suit against the treating psychiatrist alleged that negligent diagnosis and treatment exacerbated their daughter's mental condition and, in light of the ensuing and ultimately baseless criminal action, had also harmed the parents. A jury awarded the patient nearly $60,000 in damages and

9. Madame Justice Todd's Dissenting Opinion asserts that the Court manipulates the question presented to divorce the analysis from the facts and introduce unwarranted complication while, at the same time, shutting the door to potential future cases where a finding of duty may be warranted. Dissenting Opinion at 344–45 n. 3, 346 n. 5, 52 A.3d at 1281–82 n. 3, 1282 n. 5. As will be further developed *infra*, this is not so. We have endeavored to render a determination that springs from the facts before us in this appeal, while recognizing that our task is not simply to decide this case, but also to provide guidance upon the broader legal issue, which is of first impression. By necessity, this undertaking requires breadth of vision and consideration of both sides of the coin: the facts of a given case on one side, and the law, which will almost always be more conceptual, on the other.

awarded her parents over $200,000 in damages. The Superior Court affirmed, but this Court reversed and limited recovery to the patient alone. We held that while a psychiatrist owed a duty of care to the patient, that duty did not extend to her parents.

In determining whether a duty to the patient's parents existed in *Althaus*, this Court set forth factors a court must consider in deciding whether a duty is to be imposed upon a given defendant: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." 756 A.2d at 1169. *Accord Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005). The *Bilt–Rite* Court, further quoting *Althaus*, summarized "the traditional considerations of public policy involved in any assessment of the existence of a duty of care":

> [I]t must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered. . . . To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:
>
>> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: [t]he hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the

loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

866 A.2d at 280–81 (internal citations and quotation marks omitted).

■ The well-settled standard of care for a general medical practitioner is to "possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable [person]." *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835, 838 (1959). *Accord Toogood v. Owen J. Rogal, D.D.S.*, 573 Pa. 245, 824 A.2d 1140, 1150 (2003) ("A physician owes his patient a duty to employ that degree of knowledge, skill, and care ordinarily possessed by members of the medical profession. There is no requirement that he be infallible, and making a mistake is not negligence as a matter of law. In order to hold a physician liable, the burden is upon the plaintiff to show that the physician failed to employ the requisite degree of care and skill.").[10]

By contrast, this Court has not yet spoken specifically to whether medical specialists should be held to "heightened" standards of care in their particular fields, which is a predicate assumption encompassed within appellees' theory of their case. The Superior Court, however, has generally held that "a specialist physician is held to a higher standard of care than a general practitioner when the specialist is acting within his or her specialty" and that the specialist "is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases

10. Notably, the *Toogood* formulation omits consideration of the defendant doctor's "locality," which many jurisdictions no longer emphasize in the modern era.

within the specialty." *Winschel v. Jain,* 925 A.2d 782, 797 (Pa.Super.2007); *Maurer v. Trustees of Univ. of Pennsylvania,* 418 Pa.Super. 510, 614 A.2d 754, 758 (1992) (*en banc*) (same).

Since this Court has not yet spoken directly to the question, consideration of what jurisprudence our sister states have determined to be applicable is helpful. In addition to Pennsylvania, it appears that all, or nearly all, jurisdictions in the United States have authority that would hold medical specialists to some differentiated or heightened standard of care compared to that governing general practitioners, especially where practitioners hold themselves out as specialists or are board-certified in a specialized field. There is significant variation in the applicable standard, or rather, in the manner of expressing the distinct test. Courts in fourteen states and the District of Columbia have expressly adopted a "national" standard of care for doctors who hold themselves out as specialists in a given area of medicine; these practitioners are held to the same standard of care as any other specialist practicing in the same specialty in the United States.[11] Twenty-six other states maintain variants of an enhanced "same specialty" standard, without express geographical dimensions, similar to that expressed by our Superior Court in *Winschel* and *Maurer;* these jurisdictions arrived at the "heightened" specialty standard via common law, model or standard jury instruction, or statutory enactment.[12] The remaining jurisdic-

---

**11.** *See Drs. Lane, Bryant, Eubanks & Dulaney v. Otts,* 412 So.2d 254, 257–58 (Ala.1982); *Smethers v. Campion,* 210 Ariz. 167, 108 P.3d 946, 950 (Ariz.Ct.App.2005); *Hall v. Frankel,* 190 P.3d 852, 858 (Colo.App. 2008); *Smith v. Andrews,* 289 Conn. 61, 959 A.2d 597, 602 (2008); *Hill v. Medlantic Health Care Group,* 933 A.2d 314, 325 (D.C.2007); *Roberts v. Tardif,* 417 A.2d 444, 451–52 (Me.1980); *Estate of Northrop v. Hutto,* 9 So.3d 381, 384 (Miss.2009); *Chapel v. Allison,* 241 Mont. 83, 785 P.2d 204, 207 (1990); *Orcutt v. Miller,* 95 Nev. 408, 595 P.2d 1191, 1194–95 (1979); *Spencer By and Through Spencer v. Seikel,* 742 P.2d 1126, 1128 (Okla.1987); *Mosley v. Owens,* 108 Or.App. 685, 816 P.2d 1198, 1201– 02 (1991); *Moultrie v. Med. Univ. of South Carolina,* 280 S.C. 159, 311 S.E.2d 730, 731 (1984); *Veith v. O'Brien,* 739 N.W.2d 15, 29 n. 23 (S.D.2007); *Walker v. Sharma,* 221 W.Va. 559, 655 S.E.2d 775, 780–81 (2007); *Pina v. Christensen,* 206 P.3d 1298, 1301 (Wyo.2009).

**12.** *See Zaverl v. Hanley,* 64 P.3d 809, 817 (Alaska 2003) (common law); *Scott v. Rayhrer,* 185 Cal.App.4th 1535, 111 Cal.Rptr.3d 36, 46 (2010)

tions retain some form of the "locality rule," which ties the standard of proof in medical malpractice cases to a geographic area, such as the state in question or, more generically, the "same or a similar locality." While, for example, Montana maintains the national standard for its specialists and a "same or similar community" standard for its general practitioners, see *Chapel v. Allison*, 241 Mont. 83, 785 P.2d 204, 207, 209 (1990), other states do not express such a distinction.[13]

(construing CACI (California standard jury instruction) No. 502); *Tyler v. Dworkin*, 747 A.2d 111, 124 (Del.Super.Ct.1999) (construing Del. Code. Ann. Tit. 18, § 6801 (1976) (amended 1998)); *Pemberton v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.*, 66 F.Supp.2d 1247, 1255 n. 21 (N.D.Fla.1999) (construing Fla. Stat. § 766.102 (1976) as amended in 1997); *McDaniel v. Hendrix*, 260 Ga. 857, 401 S.E.2d 260, 262 (1991) (construing Ga.Code. Ann. § 51–1–27 (1982)); *Tittle v. Hurlbutt*, 53 Haw. 526, 497 P.2d 1354, 1358 & n. 5 (1972) (common law); *Childs v. Pinnacle Health Care, LLC*, 399 Ill.App.3d 167, 339 Ill.Dec. 332, 926 N.E.2d 807, 819–20 (2010) (common law); *Vergara by Vergara v. Doan*, 593 N.E.2d 185, 187 (Ind.1992) (common law); *Schroeder v. Albaghdadi*, 744 N.W.2d 651, 655–56 (Iowa 2008) (common law); *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301, 1312–13 (1985) (common law); *Hamby v. Univ. of Kentucky Med. Ctr.*, 844 S.W.2d 431, 434 (Ky.Ct.App. 1992) (common law); *Ardoin v. Hartford Accident & Indem. Co.*, 360 So.2d 1331, 1335 (La.1978) (construing La.Rev.Stat. § 9:2794 (1975) (amended 1979)); *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 349 A.2d 245, 253 (1975) (common law); *Palandjian v. Foster*, 446 Mass. 100, 842 N.E.2d 916, 920 (2006) (common law); *Larsen v. Yelle*, 310 Minn. 521, 246 N.W.2d 841, 845 (1976) (common law); *Lake v. McCollum*, 295 S.W.3d 529, 535 (Mo.Ct.App.2009) (common law); *Dent v. Exeter Hosp., Inc.*, 155 N.H. 787, 931 A.2d 1203, 1212 (2007) (construing N.H.Rev.Stat. Ann. § 507–E:2 (1986)); *Marshall v. Klebanov*, 188 N.J. 23, 902 A.2d 873, 879 (2006) (common law); *Toth v. Cmty. Hosp. at Glen Cove*, 22 N.Y.2d 255, 292 N.Y.S.2d 440, 239 N.E.2d 368, 372–73 (1968) (common law); *Belk v. Schweizer*, 268 N.C. 50, 149 S.E.2d 565, 569–70 (1966) (common law); *Berdyck v. Shinde*, 66 Ohio St.3d 573, 613 N.E.2d 1014, 1021 (1993) (common law); *Riley v. Stone*, 900 A.2d 1087, 1093 (R.I.2006) (common law); *King v. Flamm*, 442 S.W.2d 679, 681 (Tex.1969) (common law); *Farrow v. Health Servs. Corp.*, 604 P.2d 474, 476–77 (Utah 1979) (common law); *Smith v. Parrott*, 175 Vt. 375, 833 A.2d 843, 847 (2003) (construing Vt. Stat. Ann. Tit. 12, § 1908 (1975)); *Shier v. Freedman*, 58 Wis.2d 269, 206 N.W.2d 166, 173–74 (1973) (common law).

13. *See Mitchell v. Lincoln*, 366 Ark. 592, 237 S.W.3d 455, 459 (2006) (construing "same or similar locality" in Ark.Code Ann. § 16–114–206 (1979)); *McDaniel v. Inland Northwest Renal Care Group–Idaho, LLC*, 144 Idaho 219, 159 P.3d 856, 859 (2007) (construing "community standard" in Idaho Code Ann. § 6–1012 (1976)); *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1, 651 N.W.2d 356, 364

As a matter of logic and practicality, we query whether the characterization of a specialist's duty of care as "higher" or "heightened" is particularly useful. Rather, it seems that the theory of recovery fits neatly within the usual approach to malpractice cases, but with a practical and powering recognition that the medical duty at issue must be calibrated to account for what may reasonably be expected of medical specialists. Put another way, to hold a medical specialist to the standard of care governing his specialty may articulate a duty that is different, distinct, and more precise than that governing a general practitioner, but the targeted duty is not thereby "heightened." The test is still normative, comparative, and powered by the familiar reasonableness standard. Nomenclature issues aside, we have no difficulty accepting, for decisional purposes, the parties' shared predicate assumption that medical specialists may properly be held to the particularized standard of care governing their area of specialty.

Appellees' specific theory concerning a "heightened" duty for general practitioners in this circumstance depends upon a second predicate assumption respecting mental health specialists, which is that the standard of care governing that practice area necessarily and strictly prohibits mental health professionals from engaging in sexual relations with patients, and that accordingly, tort liability may properly arise from deviations from that proffered prohibition. But, neither the Pennsylvania General Assembly nor this Court has yet recognized such a prohibition as part of the duty of mental health

n. 17 (2002) (construing "community standard" in Mich. Comp. Laws § 600.2912a (2000)); *Hoffart v. Hodge*, 9 Neb.App. 161, 609 N.W.2d 397, 406 (2000) (construing "same or similar locality" in Neb.Rev.Stat. § 44–2810 (1976)); *Vigil v. Miners Colfax Med. Ctr.*, 117 N.M. 665, 875 P.2d 1096, 1099 (N.M.Ct.App.1994) (pursuant to uniform jury instructions, specialists have heightened duty compared to general practitioners but in both instances "due consideration" is given to locality); *Hopkins v. McBane*, 427 N.W.2d 85, 86 (N.D.1988) (stating "similar localities" standard); *Stovall v. Clarke*, 113 S.W.3d 715, 722–23 (Tenn. 2003) (construing "same or similar community" in Tenn.Code Ann. § 29–26–115(a) (1975)); *Smith v. Irving*, 268 Va. 496, 604 S.E.2d 62, 65 (2004) (construing statewide standard of care expressed in Va.Code. § 8.01–581.20 (1992)); *Bauer v. White*, 95 Wash.App. 663, 976 P.2d 664, 666 (1999) (construing statewide standard expressed in Wash. Rev.Code § 7.70.040(1) (1983)).

professionals for purposes of liability for damages in tort.[14] There is no Pennsylvania statute that purports to fix the tort standard of care for mental health professionals, much less a statute that says that a mental health specialist's sexual affair with a patient is actionable in tort. Nor is there any case from this Court suggesting such a prohibition. In *Pistone,* this Court referred in a footnote to the mishandling of the transference phenomenon as a basis for malpractice actions brought against mental health professionals in Georgia, Michigan, Missouri, and Minnesota, and quoted the detailed description of transference in the pertinent case from Minnesota. That particular discussion in *Pistone,* however, merely described a judicial approach to malpractice insurance coverage; an approach the *Pistone* Court ultimately rejected. 726 A.2d at 342 n. 3, 344. The *Pistone* footnote obviously described some considerations that are relevant here, but the case as a whole did not pose or answer the predicate question here. *Pistone* involved whether malpractice insurance coverage was implicated in the instance of a doctor's nonconsensual sexual assault upon a patient, not a consensual sexual relationship arising in the wake of treatment by a mental health professional (or a general practitioner).

Likewise, no Superior Court decision has held that the duty of care owed by mental health professionals to their patients embraces a strict proscription against sexual affairs, such that a breach may result in tort liability. The *Long* court did not

14. Pennsylvania decisional law has recognized that inappropriate sexual contact with a patient may be grounds for action by Pennsylvania's various disciplinary and ethics boards governing mental health professionals, based on 49 Pa.Code § 41.81(a) ("Sexual intimacies between a psychologist and a current client/patient, or an immediate family member of a current client/patient, are prohibited."). *See Starr v. State Bd. of Med.,* 720 A.2d 183 (Pa.Cmwlth.1998) (affirming revocation of psychiatrist's license for engaging in sexual relations with patients in violation of Medical Practice Act of 1985, 63 P.S. § 422.41(8)); *Morris v. State Bd. of Psychology,* 697 A.2d 1034 (Pa.Cmwlth.1997) (affirming revocation of psychologist's license for engaging in sexual relations with patient in violation of Professional Psychologists Practice Act, 63 P.S. § 1208(a) and Code of Ethics, 49 Pa.Code § 41.61) (Principle 6, Section (b)); *Giddings v. State Bd. of Psychology,* 669 A.2d 431 (Pa. Cmwlth.1995) (affirming suspension of psychologist's license for having sexual relationship with patient in violation of Code of Ethics).

purport to find such a duty under Pennsylvania law; rather, it merely discussed the non-binding North Carolina case exclusively relied upon by the plaintiff and distinguished that case on multiple grounds, including that the case spoke of a psychiatrist's special duty under North Carolina law, while *Long* involved a general practitioner. The Superior Court has discussed the theory in another case involving a malpractice action brought against a psychiatrist by a patient premised upon a sexual relationship and the transference phenomenon, but only for purposes of deciding the statute of limitations question that was actually presented. *See Haggart v. Cho,* 703 A.2d 522 (Pa.Super.1997).

Courts in those other states that have addressed the prospect of tort liability arising from a mental health professional's consensual sexual conduct with a patient have largely held that such a claim may indeed be viable. In these jurisdictions, the cause of action is often tied to the mental health professional's alleged mishandling of transference, which occurs when a therapist encourages a mental health patient to "displace" feelings regarding other figures in the patient's life, often parents, onto the therapist. The therapist is trained to manage and use transference as a therapeutic tool.[15] When transference occurs, the therapist helps the patient to contend with previously repressed or unresolved feelings so that the patient may improve. But, mental health professionals recognize, transference magnifies the patient's mental and emotional vulnerability; it is for that reason that some courts have held that the therapist must refrain from taking advantage of the circumstances to engage in what would otherwise be non-actionable (albeit ethically questionable) consensual sexual conduct with a patient. The Ninth Circuit has explained this link between transference and malpractice as follows: "The crucial factor in the therapist-patient relationship which leads to the imposition of legal liability for conduct which arguably

15. Courts that have explored transference in some depth generally view it as a concept developed by Sigmund Freud, but transference has also been defined somewhat more generally as "an experience in the present that resembles one from the past [and that] can trigger similar feelings and confusions." *In re Greene,* 204 P.3d 285, 295 (Wyo.2009).

is no more exploitative of a patient than sexual involvement of a lawyer with a client, a priest or minister with a parishioner, or a gynecologist with a patient is that lawyers, ministers and gynecologists do not offer a course of treatment and counseling predicated upon handling the transference phenomenon." *Simmons v. United States*, 805 F.2d 1363, 1366 (9th Cir.1986).

A typical case, often cited by courts considering this point, is *St. Paul Fire & Marine Insurance v. Love*, 459 N.W.2d 698, 702 (Minn.1990), in which the defendant, a licensed psychologist, engaged in a sexual relationship of several months' duration with the plaintiff, a married female who was the defendant's patient. After the affair was discovered by the plaintiff's husband, who was also being counseled by the defendant, the couple sued for malpractice. The defendant's malpractice insurer filed a declaratory judgment action to determine coverage; the trial court found that the policy in question did not provide coverage, but the intermediate appellate court reversed. The Supreme Court of Minnesota accepted the case on the coverage question and in the course of its analysis, stated that the underlying conduct by the defendant amounted to the negligent mishandling of transference and, because transference is so closely bound to the patient-therapist dynamic, the defendant had committed professional malpractice when he involved himself sexually with his patient: "The medical and legal communities uniformly agree that a psychiatrist's mishandling the transference phenomenon during treatment and taking sexual advantage of his patient is malpractice or gross negligence." 459 N.W.2d at 700 (citing Louisell & Williams, 2 Medical Malpractice ¶ 17A.27, at 85–86).[16] Thus, the prevailing view among the states that have

16. States which have addressed this specific point have generally allowed a cause of action in malpractice to proceed when allegations are made that a mental health practitioner improperly engaged in sexual relations with a patient. In some cases, the point is tangential to another disputed issue, such as the statute of limitations or the scope of malpractice insurance coverage; but, these cases express no dispute with the basic premise that the cause of action is viable. *See McNall v. Summers*, 25 Cal.App.4th 1300, 30 Cal.Rptr.2d 914, 921 (1994); *Morgan v. Psychiatric Inst. of Washington*, 692 A.2d 417, 425–26 (D.C. 1997); *St. Paul Fire and Marine Ins. Co. v. Mitchell*, 164 Ga.App. 215,

considered the issue in the context of a mental health professional's conduct is that sexual relations with a patient, even if ostensibly consensual, may be the basis for a viable malpractice claim, particularly when transference occurs during the course of the therapy.

Some states have codified the tort. Illinois, for example, has a broad version of the action applying to psychotherapists, as well as to both licensed and unlicensed mental health professionals. Thus, the "Sexual Exploitation in Psychotherapy, Professional Health Services, and Professional Mental Health Services Act," Ill. Comp. Stat. 740/140–2 (1989, amended 1997), recognizes, in pertinent part, that "[a] cause of action against a psychotherapist, unlicensed health professional, or unlicensed mental health professional for sexual exploitation exists for a patient or former patient for injury caused by sexual contact with the psychotherapist, unlicensed health professional, or unlicensed mental health professional." California has a narrower enactment, limited to psychotherapists, embracing psychiatrists as well as both licensed clinical social workers and associate clinical social workers who may not yet be licensed. Thus, California Civil Code § 43.93(b) (2003) provides that: "A cause of action against a psychotherapist for sexual contact exists for a patient or former patient for injury caused by sexual contact with the psychotherapist." A handful of other states have adopted statutory enactments in this vein. *See* Minn.Stat. §§ 604.20, 604.201 (1986) (applies to

296 S.E.2d 126, 129 (1982); *Horak v. Biris*, 130 Ill.App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13, 17–18 (1985); *Grzan v. Charter Hosp. of Northwest Indiana*, 702 N.E.2d 786, 791 (Ind.Ct.App.1998); *Barringer v. Rausch*, 900 So.2d 232, 236 (La.Ct.App.2005); *Palermo v. Brennan*, 41 Mass.App.Ct. 503, 672 N.E.2d 540, 543 n. 10 (1996); *Zipkin v. Freeman*, 436 S.W.2d 753, 756–61 (Mo.1968); *McKay v. Ciani*, 288 A.D.2d 587, 732 N.Y.S.2d 447, 450–51 (2001); *MacClements v. LaFone*, 104 N.C.App. 179, 408 S.E.2d 878, 880 (1991); *Midwest Med. Ins. Co. v. Doe*, 589 N.W.2d 581, 583 n. 2 (N.D.1999); *Darnaby v. Davis*, 57 P.3d 100, 108–09 (Okla.Civ.App.2002); *Roe v. Jefferson*, 875 S.W.2d 653, 658 (Tenn.1994); *Lenhard v. Butler*, 745 S.W.2d 101, 103 (Tex.App.1988); *Schuurman v. Shingleton*, 26 P.3d 227, 232 (Utah 2001); *Am. Home Assur. Co. v. Cohen*, 124 Wash.2d 865, 881 P.2d 1001, 1005 (1994); *Sisson v. Seneca Mental Health/Mental Retardation Council*, Inc., 185 W.Va. 33, 404 S.E.2d 425, 428–29 (1991); *L.L. v. Med. Protective Co.*, 122 Wis.2d 455, 362 N.W.2d 174, 178 (Wis.Ct.App.1984).

"physician, psychologist, nurse, chemical dependency counselor, social worker, member of the clergy, marriage and family therapist, mental health service provider, licensed professional counselor, or other person, whether or not licensed by the state, who performs or purports to perform psychotherapy"); N.C. Gen.Stat. §§ 90–21.41, 90–21.42 (1999) (applies to licensed psychiatrist, psychologist, licensed professional counselor, substance abuse professional, social worker engaged in clinical social work practice, fee-based pastoral counselor, licensed marriage and family therapist, or mental health service provider, who performs or purports to perform psychotherapy); Wis. Stat. § 895.441 (1986) (applies to "physician, psychologist, social worker, marriage and family therapist, professional counselor, nurse, chemical dependency counselor, member of the clergy or other person, whether or not licensed or certified by the state, who performs or purports to perform psychotherapy").[17]

Significantly, the parties have not identified, and our research has not disclosed, a single jurisdiction that has squarely rejected the view that a mental health professional's conduct in engaging in a sexual affair with a patient is actionable in tort. The most that can be said, in counterpoint, is that some state courts have been reluctant to view such conduct as malpractice, even where some evidence of transference is presented. In *Roe v. Jefferson*, 875 S.W.2d 653 (Tenn.1994), Tennessee's high court decided against a plaintiff on statute of limitations grounds, but also expressed ambivalence about allegations of transference in the malpractice context: "Initially, this Court has serious reservations about the Court of Appeals' reliance on the transference phenomenon in this case. This phenomenon, although generally accepted in the field of psychotherapy, is susceptible to many differing interpretations and has not yet been completely verified by quantitative,

17. Some states have gone further and adopted criminal statutes addressing the problem of mental health professionals who engage in sexual contact or conduct with patients; these statutes categorize such conduct as felonious. *See, e.g.,* Ariz.Rev.Stat. § 13–1418; Colo.Rev. Stat. § 18–3–405.5; Fla. Stat. § 491.0112; S.D. Codified Laws §§ 22–22–27 through 22–22–29.

objective studies." *Id.* at 657 (citation omitted). And, in *Carmichael v. Carmichael,* 597 A.2d 1326 (D.C.1991), the District of Columbia appellate court reversed a trial court's entry of judgment on a malpractice claim against the defendant psychologist, who had engaged in consensual sexual relations with his patient; the patient subsequently suffered depression and angst, and exhibited suicidal tendencies. In the *Carmichael* court's view, the evidence presented to the trial court was insufficient to pinpoint any malpractice on the defendant's part as the primary cause of the plaintiff's injuries, even if it was likely that some "transference abuse" had occurred: "the symptoms identified as consistent with [defendant's] malpractice were also consistent with the symptoms arising from other circumstances connected with [plaintiff's] childhood and relations with her parents. Under these circumstances, [plaintiff's expert's] testimony does not reflect a sufficiently certain opinion that the malpractice caused [plaintiff's] psychological injuries." *Id.* at 1330. *Roe* and *Carmichael* involved mental health specialists, which makes them inapposite here, but they provide some skeptical counterweight to the far greater number of jurisdictions which, to date, have viewed the misuse of transference by mental health specialists as a basis for tort liability.

Given the existing weight of legal authority, and the apparent common acceptance of the transference phenomenon as a conscious therapeutic model for mental health professionals, which those specialists know (or should know) may have consequences making their patients particularly vulnerable to sexual exploitation, we will accept, for purposes of decision, appellees' second predicate assumption: that Pennsylvania would hold mental health professionals to a standard of care which would include a duty to avoid sexual contact with their patients.[18]

18. We make the assumption for decisional purposes only because we need not do more to decide this case, which does not involve a mental health specialist, and also because we believe the caution expressed by the *Roe* court is well-taken. The judicial branch is not as well-equipped as the legislative branch to plumb the operation, scope, and consequences of the transference phenomenon, (especially in this appeal,

■ Turning to the specific question involving the duty of non-mental health practitioners, we first note that courts have been reluctant to recognize a cause of action in malpractice when consensual sexual relations arise out of a doctor-patient relationship if the underlying medical care remains purely physical and lacks any measurable psychological or emotional component.[19] For example, in *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000), the plaintiff first saw the defendant, a general practitioner, "for treatment regarding a constant lack of energy." A sexual relationship between the two developed shortly thereafter that lasted for roughly five years; after it ended unhappily, the plaintiff suffered severe emotional distress, became suicidal, and was unable to work. The plaintiff filed suit, and the trial court granted the defendant doctor's motion for summary judgment, holding that the defendant's conduct did not amount to malpractice. The Supreme Court of Nebraska affirmed: "When the only connection between the sexual misconduct and treatment is that the activity occurred in the medical professional's office, such a connection is too remote from the actual rendering of proper services to impose liability upon the medical professional for malpractice." *Id.* at 614. The plaintiff alleged that transference had occurred, which rendered her engagement in sexual

which presents only a preliminary record), and reliance upon purely secondary sources for purposes of establishing a newly recognized duty for mental health professionals would be premature.

19. Justice Todd's Dissenting Opinion makes much of the fact that Pennsylvania regulations governing state board certified medical doctors (aside from mental health professionals, who are covered by specific provisions) dictate that sexual relations between practitioners and patients are prohibited misconduct for which a doctor may be subject to disciplinary action under 16 Pa.Code §§ 16.61, 16.110. Dissenting Op. at 344 n. 2, 52 A.3d at 1281 n. 2 and passim. The task here, however, is to determine whether that standard, which derives from rules of professional conduct and principles set forth by state boards and also in the American Medical Association Code of Ethics, should be transported into the tort realm as a newly recognized cause of action, and whether any such expansion is properly a question for the judiciary, or might better be undertaken by the General Assembly and those professional boards that engage with this problem regularly. The dissent would conclude that in light of the extant standards within the medical field itself, we "may" undertake determination of this issue; the more properly framed question is whether we "should" do so.

relations with the defendant nonconsensual. But, the court declined to either adopt a malpractice theory associated with transference or to allow the plaintiff's claim to proceed: "Although we have no evidence before us regarding the transference phenomenon and, therefore, we will not opine on the general acceptance of the transference phenomenon in the mental health field, we do note that transference is not a recognized component in the medical treatment of physical conditions. Moreover, there is no evidence in the record that the transference phenomenon was a factor in the instant case." *Id.* at 615.

Other states have reached similar conclusions. *See, e.g., Gunter v. Huddle,* 724 So.2d 544, 546 (Ala.Civ.App.1998) ("[T]he great weight of authority holds that a sexual relationship between a nonpsychiatric physician and a patient is outside the scope of the physician's treatment, and is not actionable as malpractice") (collecting cases from California, Minnesota, and Oregon); *Atienza v. Taub,* 194 Cal.App.3d 388, 239 Cal.Rptr. 454, 456–58 (1987) (malpractice claims against physician who treated plaintiff for phlebitis and then engaged in affair with plaintiff did not state cause of action); *Collins v. Covenant Mut. Ins. Co.,* 604 N.E.2d 1190, 1196–97 (Ind.App. 1992) (collecting cases from Idaho, Michigan, Minnesota, South Carolina, and Washington; opinion ultimately vacated on procedural grounds not relevant to merits); *Korper v. Weinstein,* 57 Mass.App.Ct. 433, 783 N.E.2d 877, 879 (2003) ("It is settled that consensual sexual conduct between a medical practitioner and a patient does not constitute medical malpractice."); *Odegard v. Finne,* 500 N.W.2d 140, 143–44 (Minn.App.1993) ("Essentially, appellant complains that she had an unhappy affair with a man who happened to be her doctor treating her for colitis. This is plainly insufficient to make out a cause of action for professional negligence."); *Darnaby v. Davis,* 57 P.3d 100, 104 (Okla.Civ.App.2002) (collecting cases and holding that "sexual activity between a doctor and a patient, notwithstanding the existence of a doctor-patient relationship, without more, does not give rise to a cause of action."). *But see Hoopes v. Hammargren,* 102 Nev.

425, 725 P.2d 238, 242 (1986) (plaintiff's evidence that defendant neurosurgeon who treated plaintiff for numbness in her back and legs took advantage of her to commence sexual affair presented genuine issue of material fact; trial court's grant of summary judgment in favor of defendant reversed: "While [defendant] may also be subject to professional sanctioning, [plaintiff] has the right to seek redress in the courts. Sexual advantage of the physician-patient relationship can constitute malpractice.").

The circumstances giving rise to appeal in the case *sub judice* occur in the grey area between purely physical medical care and mental and emotional care, which may entail a broad range of treatments from simple counseling, to a single prescription by a general practitioner to treat a regular patient's occasional anxiety (perhaps a sleep disorder or fear of flying), to comprehensive and sustained treatment by mental health specialists to address serious psychological illnesses such as schizophrenia and bipolar disorder.[20] The question here is whether to extend a mental health specialist's presumed duty to refrain from sexual activity with patients to general practitioners who provide some degree of mental or emotional counseling to a patient, or who prescribe common medications for depression or anxiety for that patient, and then engage in consensual sexual relations with that patient.[21] In instances

**20.** Justice Todd's Dissenting Opinion ignores the practical reality that mental and emotional issues and care can and may occur along a broad spectrum, and focuses instead on what the dissent labels, without explication, "mental disorders." *See, e.g.,* Dissenting Op. at 345–46 & n. 5, 52 A.3d at 1282–83 & n. 5. We have attempted to approach this case, presented on our discretionary docket, and representing our first foray into this area, with an appreciation of the complexities governing the absolute duty we are asked to recognize. Respectfully, the dissent's oversimplification avoids the difficult mix of facts, law, and policy that the proposed *per se* duty presents, difficulties that we have attempted to navigate with care. Ironically, while faulting the Court for our alleged minimization of the types of mental health care that general practitioners increasingly provide, the dissent focuses exclusively on the more serious end of the mental health counseling and treatment spectrum, thus indulging the very error in approach for which it mistakenly criticizes the Court.

**21.** Justice Todd's Dissenting Opinion supports judicial creation of a legal duty in this circumstance. *See, e.g.,* Dissenting Op. at 342, 346 n. 6, 356, 52 A.3d at 1280, 1283 n. 6, 1289. At first blush, the duty in

like these, where treatment by a non-mental health profession-
al is alleged to have included some form of directed emotional
or mental counseling, appellees are correct that some courts
have been receptive to the sort of claim advanced here. *See
McCracken v. Walls–Kaufman,* 717 A.2d 346, 352 (D.C.1998)
(involving patient's sexual relationship with defendant chiro-
practor: "[I]f a medical professional not practicing in the field
of mental health enters into a relationship of trust and confi-
dence with a patient and offers counseling on personal matters
to that patient, thus taking on a role similar to that of a
psychiatrist or psychologist, that professional should be bound
by the same standards as would bind a psychiatrist or psychol-
ogist in a similar situation."); *Dillon v. Callaway,* 609 N.E.2d
424 (Ind.App.1993) (patient first encountered doctor while
hospitalized for treatment of multiple joint pain; plaintiff
continued to see doctor as appointments became more like
traditional psychotherapy sessions; sexual relationship en-
sued; court holds that, even though doctor was not mental
health professional, he acted as patient's therapist and there-
fore sexual involvement with her amounted to compensable
malpractice); *Darnaby v. Davis,* 57 P.3d 100, 108 (Okla.Civ.
App.2002) (general practitioner began treating plaintiff for
anxiety and chest pains in 1990, eventually referring plaintiff
to psychiatrist, who diagnosed multiple disorders; plaintiff
returned to general practitioner's care and sexual relationship
ensued; defense jury verdict overturned on grounds that trial
court's instructions "did not address the issue of whether [the
defendant] took on the role of a therapist, thus giving rise to

question seems relatively limited, and there is no question that the
conduct at issue is disapproved within the medical profession and its
adjudicative entities. But, the duty in civil tort law that the dissent
would create is not actually limited in any meaningful fashion. Recog-
nition of an absolute "duty" in general practitioners to refrain from
sexual relations with patients they have treated for mental health issues
establishes what amounts to a *per se* cause of action: showing both
treatment and sexual relations proves the case, irrespective of other
particulars of the relationship. Given that mental or emotional issues
embrace a wide variety of maladies, and varying methods, levels and
intensity of treatment, the duty the dissent would create, in practice,
would be broader than the dissent implies.

the transference phenomenon, which he then failed to properly handle, therefore providing substandard care.").

■ There is, then, some basis in the decisional law of other states for the premise that appellees forward here—that the duty of mental health professionals to avoid exploitative sexual relationships with their patients should be extended to general practitioners if those practitioners take on the responsibility of tending to their patients' mental and emotional issues. To determine whether to impose that particularized duty upon general practitioners as a matter of Pennsylvania common law, we look to the *Althaus* factors, which consider: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk involved and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Id.* at 1169.

Concerning the first *Althaus* factor, the relationship between the parties, the Superior Court opined that patients are on "unequal playing fields" with their doctors, who possess superior knowledge of medicine and health. *Thierfelder,* 978 A.2d at 366. That is true in most, but not all cases, and it is certainly true in this case. Where present, we do not doubt that this relative disparity gives rise to a relationship based on trust and the general duty of care that any doctor owes to his patients. As explained above, when the relationship is one centered in the rendering of psychotherapy, the patient is in a particularly vulnerable mental and emotional state, which has caused courts to recognize a particularized duty on the part of the mental health professional to, at the least, refrain from any action or activity that would worsen the patient's insecurities and fears. According to the cases and secondary literature addressing transference, it can be a powerful therapeutic tool, and mental health professionals employing transference must take pains to facilitate and direct it when it occurs in their patients. Courts that have imposed a duty upon mental health professionals to avoid sexual contact with patients recognize that mental health professionals should not engage in conduct that preys upon their patients' hopes, fears, feel-

ings, and personal issues, which are the very basis of the therapist-patient relationship.

But, the relationship between the parties is not the same where the mental health treatment is incidental and rendered by a general practitioner; in such circumstances, the first *Althaus* factor weighs against holding general practitioners to the specialized duty that prohibits mental health professionals from engaging in sexual relations with their patients.[22] As both parties recognize, it has become increasingly common for primary or general care physicians to advise patients on relatively common matters of emotional or mental import, like stress or depression, and also to prescribe widely-used medications for such conditions. *See* Appellant's Brief at 18; Appellees' Brief at 11 (citing study in New England Journal of Medicine finding that even as early as 2000, more than 75% of all mental health therapy for depression was rendered by general practitioners). There is a qualitative difference between this kind of treatment, which goes more to the patient's overall well-being, and the sort of dedicated course of therapy provided by a mental health professional. This is particularly so because a general practitioner is less likely than a mental health professional to recognize, understand, and employ transference as a conscious therapeutic method. While there is a relationship of trust in any doctor-patient compact, we believe there is insufficient basis in consideration of this first *Althaus* factor to warrant importation of the same *per se* duty that would apply to mental health professionals.[23]

22. We have used the qualifier "incidental" to distinguish the sort of treatment that arises during the course of a preexisting doctor-patient relationship, one not originally or usually involving mental health treatment, from the sort of targeted treatment rendered by a mental health specialist. This "incidental" mental health treatment may embrace a wide range of problems and care. Recognition of this distinction is not speculative, as Justice Todd's Dissenting Opinion suggests. Indeed, the dissent would have it both ways: the care and duty is monolithic when the dissent formulates its rule, but episodic when it comes to criticizing the Court's approach. The dissent's *per se* duty apparently would embrace the most "incidental" of mental health treatment rendered by a general practitioner, a highly ambiguous situation upon which to base a tort claim.

23. Justice Todd's disagreement with our balancing of the first *Althaus* factor, Dissenting Op. at 346–50, 52 A.3d at 1283–85, loses sight of the

The second *Althaus* factor is the social utility of the doctor's conduct. Obviously, sexual activity between a general practitioner and a patient has no social utility in and of itself. But, under appellees' theory, the proffered absolute duty to refrain from sexual activity is a byproduct of the rendering of incidental mental health treatment by appellant, a general practitioner. The occasion for general practitioners to address their patients' situational mental and emotional well-being arises from various potential sources, such as: doctor-patient familiarity, convenience, or insurance requirements that make general practitioners a necessary "first stop" in their patients' healthcare process. This type of occasional but more immediate treatment of increasingly common mental and emotional burdens arising from modern day lifestyles and stressors is accepted, and it obviously has significant social utility and value. Imposing the same absolute duty to avoid sexual contact with patients upon general practitioners as would be imposed upon mental health professionals employing transference necessarily burdens the social utility in general practitioners serving as first-stop medical providers for a litany of maladies, including mental and emotional issues that may not be so severe as to require a mental health specialist. This is a difficult balance—far more nuanced than the dissent allows—not particularly suited to judicial resolution as a matter of common law development.[24]

fact that the duty we are asked to recognize in this case is a particularized one of absolute avoidance of sexual conduct, deriving from a specialized duty that applies to mental health professionals. The doctor-patient relationship, which we do not by any means minimize in this appeal, obviously remains, and serves as a basis for other theories sounding in medical malpractice alleging a breach of the doctor's duty of care through improper diagnosis and treatment; and a general practitioner who undertakes to provide systematic and regular mental and emotional care to a patient may well be subject to liability in negligence if he or she mishandles the situation and worsens the patient's mental and emotional state. But, in this appeal as presented to us, appellees seek a rule that would allow them to prove their case by operation of a *per se* "heightened" duty arising out of the mere nexus between some or any form of mental or emotional assistance that may be provided by a general practitioner and the occurrence of sexual relations between the doctor and patient. We are not persuaded in this case that the relationship between the parties supports importation of a

The third *Althaus* factor is the potential risk and foreseeability of harm stemming from sexual relations between general practitioners and their patients if there has been some component of mental and emotional counseling in the course of the doctor's care. The risk and harm that can ensue if a mental health professional takes sexual advantage of his or her psychotherapy patients' vulnerability and transference of feelings to the therapist has been documented in the cases accepting the tort against mental health professionals for the negligent management of transference. In some states, a mental health professional's exploitation of transference to engage in sexual relations with a patient, if undertaken in an intentional manner, has effectively been deemed to be predatory conduct warranting criminalization. But, a general practitioner unfamiliar with transference, or less familiar with the effects of the treatment, or who is not deliberately employing the technique in undertaking basic or situational care of a patient's mental and emotional difficulties, is less likely to foresee that an apparently consensual sexual affair with the patient may risk worsening the patient's psychological prob-

*per se* duty from the mental health specialty into the realm of general practice.

24. Justice Todd's Dissenting Opinion defines the question of social utility in loaded fashion, as "the social utility of a physician having sexual relations with a patient while rendering treatment for mental disorders without legal consequences in tort," and then accuses the Court of suggesting that "there is social utility in not prohibiting a physician from having sexual relations with a patient he is treating for mental disorders." Dissenting Op. at 350–51, 52 A.3d at 1285–87. As the discussion in text makes plain, the social utility recognized by the Court reposes in the important role general practitioners have come to serve in treating their patients' mental health issues. Our approach squares with *Althaus*. *See* 756 A.2d at 1170 ("Next, we must weigh the social utility of Dr. Cohen's actions against the nature of the risk and foreseeability of harm. Unfortunately, child sexual abuse is a troubling reality in our society and reports of sexual abuse have substantially increased.... The need for prevention of child abuse is unquestionable, as is the importance of adequate psychological treatment for children who have been sexually abused. Thus, therapists who treat sexually abused children perform a valuable and useful activity to society."). Obviously, not all such first-stop treatments by general practitioners result in sexual relationships; and the fact that sexual relationships arise in some cases does not eliminate the actual social utility involved in the readier availability of treatment. As such, the dissent fails to apply the correct analysis of the social utility factor.

lems and even create new doubts, anxieties, and agitations.[25] The harm and the risk are real with regard to the patient, but this *Althaus* factor focuses on foreseeability respecting the doctor and whether a concomitant duty may reasonably be imposed on a general practitioner based solely on the nexus of some degree of mental or emotional care and the occurrence of a sexual relationship. Although it is close, we view this factor as weighing against extending a mental health professional's duty to general practitioners, even if the general practitioner has engaged in some degree of care regarding the patient's mental and emotional well-being.

Next we consider the consequence of burdening general practitioners who provide patients with some degree of incidental base-level mental and emotional care with a mental health professional's absolute duty to refrain from sexual involvement with patients. As noted in our discussion of social utility, in today's world, it is common for general practitioners to provide their patients with some form of front-line mental or emotional care; and this care may go so far as to include the prescription of medications to relieve stress-induced anxiety and even antidepressants. The proffered duty and tort would impose significant consequences on general practitioners rendering such care who become sexually involved with a patient, solely because of incidental mental health treatment. Ours is a fluid and complex society, where concepts of free will and personal responsibility hold some sway. The prophylactic absolute duty of avoidance of sexual contact proffered here excises those concepts in one narrow situation deriving from the special circumstances, vulnerability, and potential exploitation that may arise from a course of mental health treatment, based upon a phenomenon familiar to specialists in the field. To hold general practitioners providing incidental care to that same standard would have

---

25. Justice Todd's discussion of this *Althaus* factor notes that our analysis distinguishes between an "apparently consensual" sexual relationship and outright sexual exploitation by the doctor. Nevertheless, the dissent focuses largely on instances of purposeful exploitation and advantage. Dissenting Op. at 351–52, 52 A.3d at 1286–87. In assessing the question of duty, we have tried to be mindful of the complexity and variety of human interactions.

the effect of discouraging general practitioners from rendering what appears to have become, by now, relatively routine attention to their patients' mental and emotional well-being. This is not to diminish the individually devastating consequences a sexual affair with one's primary care physician might have for a mentally and emotionally fragile patient. At the least, this again is a question of policy not particularly suited to common law resolution by the judiciary. As such, we view this *Althaus* factor to weigh against imposition of a mental health professional's duty regarding sexual contact with patients upon general practitioners.[26]

Finally, we turn to the question of the public interest in appellees' proposed "solution" of extending a mental health specialist's duty to refrain from sexual involvement with patients to general practitioners who undertake some incidental treatment of patients' mental and emotional symptoms. We are, of course, aware that many issues involving the liability of physicians in this Commonwealth have been the subject of legislative concern and judicial rulemaking in the past several years; and, from this experience, we are well aware of the complexity involved in any expansion or contraction of exposure. The public concern giving rise to a specialist's absolute duty is understandable—it protects those who seek therapeutic help for serious mental and emotional problems from having those very problems exploited by the therapist, either intentionally or negligently, for the therapist's own sexual satisfaction. But, determining whether the public interest is

26. Justice Todd argues that this formulation downplays the care that a general provider may render to a patient suffering from a mental disorder and that it would not be onerous for common law courts to require general practitioners to refrain from sexual relations with a patient if the doctor has provided some form of mental health care to the patient; the dissent adds that a physician, aware of the professional opprobrium inherent in such conduct, should not view this as a deterrent to undertaking treatment of a patient who reports mental or emotional distress. Dissenting Op. at 353–56, 52 A.3d at 1287–89. Respectfully, this misapprehends our approach, which takes pains to recognize that the sphere of doctor-patient relations, which is a subset of human interactions, is complex, and that in considering whether to recognize a new tort theory based on a previously unrecognized professional duty, it is this Court's responsibility to consider broadly, yet carefully, before taking action.

best served by applying the same absolute safeguard to general practitioners who provide some level of incidental mental and emotional support for their patients is a far more complex matter. Of course, the effect of transference may exist in a patient even where the doctor is unaware of, or does not deliberately employ, the technique; and the cases suggest that an improper sexual affair may have a potentially devastating effect on an already unsettled patient who has developed trust and confidence in his or her doctor. But, as noted, imposing this new absolute duty on general practitioners would have a high social cost, and would discourage general or primary care doctors from meeting their patients' manageable mental and emotional needs, as opposed to the focused treatment provided by a specialist. At the same time, it would likely have little effect on those doctors who would intentionally exploit their "power" over their patients to satisfy their own libidos. It is also noteworthy that other theories already exist that may encompass this scenario, such as a cause of action for intentional infliction of emotional distress, which appellees did raise initially in this litigation.[27] Other causes of action may also be employed without importing an absolute proscription regarding sexual relations with patients from cases involving mental health specialists. Accordingly, we view this factor as weighing against extension of a mental health specialist's duty to refrain from sexual relations with patients to general practitioners who provide some incidental mental and emotional care for their patients.

Having considered all of the *Althaus* factors, we decline to expand the potential malpractice liability of general practitioners to include an absolute duty, derived from the duty of mental health specialists, to avoid sexual relations with patients in circumstances where they have rendered some degree of mental and emotional treatment to the patient. To do so would be to go too far, at least for purposes of expanding tort liability through common law decision-making. To do so would also improperly blur the still-meaningful distinction

27. The claim for intentional infliction of emotional distress was dismissed via stipulation.

between the standards and duties of care borne by specialists and general practitioners. Furthermore, as our analysis above has demonstrated, the question presented implicates broad and complicated concerns of social policy involving the liability of physicians that are not particularly well suited to resolution by judicial decision. In our view, any further adjustment in this particular, narrow area is a question better suited to the policy-making branches, including the General Assembly and the Commonwealth's boards and associations charged with regulating the medical profession. This position goes no farther than recognizing that the "classic" form of medical malpractice is not easily distilled in the increasingly common context of general practitioners providing incidental, situational, or even ongoing mental and emotional support as part of overall patient care.

We recognize and respect that Justice Todd's dissent would balance the *Althaus* factors differently. However, we must register our respectful disagreement, as we have throughout this Opinion, with the dissent's mischaracterization of our balancing effort and holding as an "alteration" of the applicable test, rather than an application with which the dissent happens to disagree. *See, e.g.*, Dissenting Op. at 342, 346, 349–50, 52 A.3d at 1280, 1283, 1285. First, our holding does not forever bar the potential for finding a duty of care when a doctor who is not a mental health specialist undertakes mental health treatment with a patient and then engages in sexual relations with that patient. Rather, the question accepted for review, which our deliberations have revealed is not as simple as it might initially seem, is whether to extend a *per se* duty that would apply to mental health specialists to general practitioners, in order to support a claim for money damages. As Justice Todd's dissent itself recognizes and reiterates, professional disciplinary action remains possible, and as we have noted above, other actions in tort may remain available in cases such as this. Our disposition to remand does not foreclose pursuit of any such claims that may have been preserved and not yet addressed by the Superior Court. Second, the dissent's formulation suggests that the question of

duty we decide involves a sexual relationship pursued, perhaps purposefully, as part of appellant's "treatment" of appellee for mental health problems. We do not understand the complaint as pursuing that theory; and, in any event, the duty we are asked to embrace is much broader, and not confined to that circumstance. The dissent's formulation of the issue before us may ring well as an aphorism; but, it is an inaccurate description of the Court's holding and analysis, which hardly advances our deliberations.

Application of our holding is straightforward. The facts as alleged by appellees—the occurrence of some degree of mental and emotional care by appellant and a sexual relationship between appellant and appellee-wife—do not establish that appellant violated his duty of care to appellees, which was that of a general practitioner and not that of a mental health specialist precluded from engaging in sexual relations with a patient. In holding otherwise, the Superior Court held appellant to a novel duty and standard, which we reject.

The question is not whether this Court condones appellant's actions, nor even whether his actions amounted to a violation of medical ethics. We hold here only that, as a general practitioner, appellant was under no specific or "heightened" duty in tort to refrain from sexual relations with his patient under these circumstances. Accordingly, we vacate the order of the Superior Court and remand for consideration of any remaining preserved claims that may persist in this litigation. Jurisdiction is relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Justices SAYLOR, EAKIN, BAER, and McCAFFERY join the opinion.

Justice TODD files a dissenting opinion.

Justice TODD, dissenting.

I respectfully dissent. Determining whether there should be a duty, and, thus, a cause of action in professional negligence, when the legislature has not spoken, presents challenging questions of social policy and protection from harm. As

offered by the majority, quoting the late Dean Prosser, *"[i]n the end the court will decide whether there is a duty on the basis of the mores of the community,* always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." Majority Opinion at 319, 52 A.3d at 1265 (emphasis added). Ultimately, in this matter, the majority concludes that the mores of the community should not, for purposes of professional negligence, find any duty of care on the part of a general practitioner who, while providing mental health treatment, engages in sexual relations with a patient—behavior already deemed to be unethical—causing the patient physical and psychological injury. Importantly, the majority not only rejects finding a duty in the matter *sub judice,* it completely shuts the door on placing a duty on a physician as a matter of law—regardless of the nature of the mental health treatment rendered. I disagree with this unfortunate determination.

Even more deleterious is the majority's alteration of the *Althaus* construct, which, as I explain below, will adversely impact future application of this test.[1] In my respectful view, even in the majority's application of the altered *Althaus* test, it takes an overstated approach in its analysis—finding each and every prong of the five-prong *Althaus* test to be unsatisfied—which, in my view, simply proves too much in the physician-patient realm. For the reasons that follow, I would affirm the Superior Court's order finding that this claim in professional negligence should move beyond the pleading stage, and would find that when a physician provides treatment for a mental health disorder such as alleged here—depression—and has a sexual relationship with that patient, if the sexual relationship causes injury, the patient has alleged a cognizable cause of action against the physician in professional negligence.

Initially, it is critical to note that this case comes to us at the preliminary objections stage. In reviewing a trial court's grant of preliminary objections in the nature of a demurrer, all material facts set forth in the complaint, as well as all infer-

1. *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166 (2000).

ences reasonably deducible therefrom, are admitted as true for the purposes of review. The question presented by a demurrer is whether, on the facts averred, the law states with certainty that no recovery is possible. Where doubt exists as to whether a demurrer should be sustained, the doubt should be resolved in favor of overruling it. *MacElree v. Phila. Newspapers, Inc.,* 544 Pa. 117, 124, 674 A.2d 1050, 1053–54 (1996).

While the majority provides great detail in the factual and procedural background of this matter, the core of this dispute is relatively straightforward. JoAnn Thierfelder contends in her complaint that she and her husband, David Thierfelder, were patients of Dr. Irwin Wolfert. Mrs. Thierfelder avers that the couple divulged to Dr. Wolfert details of their intimate relations so that Dr. Wolfert could provide appropriate medical care. According to Mrs. Thierfelder, Dr. Wolfert treated her for depression and anxiety and prescribed medication for her depression. Importantly, during the course of the physician/patient relationship, Mrs. Thierfelder claims that Dr. Wolfert's treatment and medication regimen caused her to believe that Dr. Wolfert had "cured" her, that she informed him that he was her "hero," and that she believed that she was in love with him. Third Amended Complaint, at ¶ 13. Mrs. Thierfelder alleges that, after she informed Dr. Wolfert of her feelings, and while treating her for depression, Dr. Wolfert began a sexual relationship with her. After the relationship became sexual, Mrs. Thierfelder maintains that she became increasingly anxious and depressed and attempted to break off the relationship, but that Dr. Wolfert convinced her to continue the relationship. Ultimately, Mrs. Thierfelder contends she ended the relationship with Dr. Wolfert and, later, informed her husband about the affair. Because of Dr. Wolfert's actions, Mrs. Thierfelder alleges that she suffered deterioration of her psychological condition, severe depression and psychological harm, was deprived of the opportunity to obtain relief from her psychological condition, and suffered severe physical pain and mental anguish.

Professional negligence, also referred to as medical malpractice, giving rise to liability in tort, consists of a "negligent

or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act." *Quinby v. Plumsteadville Family Practice*, 589 Pa. 183, 198, 907 A.2d 1061, 1070 (2006).[2] As medical malpractice is a form of negligence, to establish a case of professional negligence, (1) there must be a duty owed to the patient by the physician; (2) the physician must have breached that duty; (3) the breach must be the proximate cause of the patient's injury; and (4) the patient must suffer damages as a result of that harm. *Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 555, 981 A.2d 145, 154 (2009).

At issue in this appeal is the question of duty. Thus, for a patient to establish professional negligence under the circumstances of this case, the patient must establish that a general practitioner had a duty to not have sexual relations with a patient for whom he is providing treatment for a mental health disorder. Of course, if such a duty exists, a patient must also establish the physician breached that duty, the breach was the proximate cause of the patient's injury, and the patient suffered damages as a result of that harm, in order for the patient to be able to obtain relief under a professional negligence theory.[3]

2.  In the context of physicians and patients, it is universally accepted that there already exists a duty on the part of a physician to conform to certain acceptable medical standards of reasonable medical care when treating a patient. Arguably, in the absence of legislative guidance defining the scope of this duty, such matters as presented in this case can be resolved according to the standards of the profession, as determined through the adjudicative process, and usually requiring expert testimony to establish the proper standard of care. *Quinby*, 589 Pa. at 199, 907 A.2d at 1070. Indeed, Mr. and Mrs. Thierfelder have offered a certificate of merit in support of their claims which provides that Dr. Wolfert's conduct departed from acceptable medical standards. In my view, however, and as discussed below, here, the standards of the profession are clearly articulated, and, thus, a determination of the existence of a duty under these circumstances may properly be undertaken by our Court.

3.  The majority progressively morphs the issue before us. We granted allocatur to determine "Whether, for purposes of determining profes-

In determining whether a duty exists for purposes of professional negligence, our Court traditionally employs the five-factor *Althaus* test. Specifically, this determination involves the weighing of discrete factors, including: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty on the actor; and (5) the overall public interest in the proposed solution. 562 Pa. at 553, 756 A.2d at 1169. Of course, as noted by the majority, the analysis is set against the backdrop of policy considerations of whether a plaintiff is

sional negligence, a general practitioner who provides mental health treatment to a patient is held to the same higher duty as a specialist in psychiatry or psychology?" *Thierfelder*, 603 Pa. 430, 984 A.2d 935 (2009) (order). In its opinion, the majority begins that the question before us is "whether a medical general practitioner who provides *incidental* mental health treatment to a patient, with whom he then engages in a sexual affair, may be held to a particularized 'specialist duty,' applicable to mental health professionals, that prohibits consensual sexual contact with patients, such that the defendant general practitioner may be subject to medical malpractice liability in tort." Majority Opinion at 298, 52 A.3d at 1253 (emphasis added). Then, the majority begins its analysis by rephrasing the issue as follows: "The question here is whether to extend a mental health specialist's presumed duty to refrain from sexual activity with patients to general practitioners who provide *some degree* of mental or emotional counseling to a patient, or who prescribe *common medications* for depression or anxiety for that patient, and then engage in consensual sexual relations with that patient." Majority Opinion at 331, 52 A.3d at 1273 (emphasis added). Not only is the progressively evolving nature of the statement of the issue troubling, but the majority's characterization of the mental health treatment at issue as "incidental" and any prescriptions as "common medications" is divorced from the complaint, to which, at this stage of the pleadings, we are limited. We do not know the type of treatment rendered by Dr. Wolfert to Mrs. Thierfelder or the nature of the medication prescribed. Further, the majority asserts that its repeated use of the qualifier "incidental" to describe the mental health treatment under consideration distinguishes "the sort of treatment that arises during the course of a preexisting doctor-patient relationship, one not originally or usually involving mental health treatment from the sort of targeted treatment rendered by a mental health specialist." Majority Opinion at 334 n. 22, 52 A.3d at 1275 n. 22. Yet, the majority does not explain the relevance of when the treatment arises in the relationship or whether the treatment is for a first-time patient or a repeat patient. Indeed, as the focus is whether the patient is being treated for mental health disorders, it appears to me that these considerations are irrelevant. Nor does the majority's state-

entitled to protection from the harm she alleges, and, even more broadly, the mores of the community.[45]

In my view, fair application and proper weighing of the *Althaus* factors leads convincingly to the conclusion that a physician who is providing treatment for a patient's mental health disorder has a duty not to engage in sexual conduct with his patient, especially in light of the vulnerabilities of a patient with a mental health disorder and the fact that a physician, as discussed below, is already prohibited from sexual relations with a patient under professional medical standards.[6]  Conversely, I find that the majority's approach to

ment of the issue account for the distinction or suggest a duty with respect to more serious treatment by a general practitioner.

4.  The majority cogently offers that our Court has not addressed the seemingly predicate question of whether professional liability arises from a mental health professional's consensual sexual conduct with a patient; however, after scholarly analysis, the majority properly offers that courts in other states have overwhelmingly concluded a claim against a mental health professional for his consensual sexual conduct with a patient gives rise to a claim in professional negligence.  Majority Opinion at 319–29, 52 A.3d at 1266–72.

5.  The majority further suggests, at some length, that courts have been reluctant to recognize a cause of action in professional liability when a general practitioner provides treatment for a physical injury, i.e., non-mental health treatment, and engages in consensual sexual conduct with a patient.  I do not quibble with its characterization of the law, but simply emphasize this issue is plainly not before us.  What I am concerned about is the majority's characterization of the circumstances before us as occurring "in the grey area between purely physical medical care and mental and emotional care, which may entail a broad range of treatments from simple counseling, to a single prescription by a general practitioner to treat a regular patient's occasional anxiety . . ., to comprehensive and sustained treatment *by mental health specialists* to address serious psychological illnesses such as schizophrenia and bipolar disorder."  Majority Opinion at 331, 52 A.3d at 1273 (emphasis added).  The broad range of treatment we consider today, however, is that given by a general practitioner—not a mental health specialist—who, as noted below, may fully engage in "comprehensive and sustained treatment" for "serious psychological illness."  Thus, the majority's division between which type of practitioner may engage in differing levels of treatment is not only unfounded, but, properly understood, sharpens the point: today's holding fails to recognize a duty on the part of a physician, and, thus, a claim in professional negligence against not only general practitioners who give a "single prescription," and engage in sexual relations with their patients, but also those generalists who provide "comprehensive and sustained treatment" for "serious psychological illness," and engage in sexual relations as well.

6.  According to the majority, placing a duty on general practitioners would create an "absolute 'duty' in general practitioners to refrain from

the *Althaus* factors, as more fully explained below, is not only unpersuasive, but alters the *Althaus* test so as to unduly limit these factors in future applications. While I address each of the *Althaus* prongs separately, the majority's alteration of the test, and its overly-broad approach, can be best demonstrated by its analysis of the first *Althaus* factor—the relationship between the parties.

**Relationship Between the Parties**—Generally speaking, the relationship between a physician and a patient creates professional obligations and legal duties; and, as recognized by our Court for over 100 years, the relation is one of trust and confidence. *See Smith v. Blachley*, 188 Pa. 550, 554, 41 A. 619, 621 (1898). Moreover, a physician holds a position of superiority over a patient based upon his expertise and the patient's vulnerable position in seeking care, which as noted involves, at its core, trust in the physician and the primacy of the patient's well-being. This inequity is only exacerbated where a patient seeks care for mental health disorders, as did Mrs. Thierfelder. In my view, this close relationship and the heightened sensitivities in the context of treatment for mental health disorders logically counsels towards recognizing a legal duty to protect patients who suffer from mental health disorders from exploitation by a physician. Moreover, this ap-

sexual relations with patients they have treated for mental health issues" and would create a *per se* cause of action. Majority Opinion at 331–32 n. 21, 52 A.3d at 1273 n. 21. First, the "absolute duty" to refrain from sexual relations with his or her patients is no different than the "absolute" ethical duty currently imposed upon physicians, with which they must abide. Thus, while I would recognize a duty on a physician when treating a patient for mental health disorders to refrain from sexual relations with that patient, doing so respects an unqualified prohibition already firmly in place. Second, and contrary to the majority's assertions that "showing both treatment and sexual relations proves the [cause of action]," *id.*, to be successful for a claim in professional negligence in these circumstances, a patient would need to establish not only treatment for a mental health disorder and sexual relations between physician and patient, but also that the sexual relations both caused and resulted in harm to the patient. Finally, while criticizing my approach as absolutist, it should be contrasted against the majority's own absolutist bar of any professional negligence liability for a general practitioner based upon sexual contact with a patient, regardless of the nature of the treatment or how severe the mental health disorder suffered by the patient.

proach to the first *Althaus* prong, and a conclusion that, at a minimum, this prong suggests the finding of a duty, is consistent with our Court's prior case law.

Indeed, our landmark decision in *Althaus* emphasized the physician-patient relationship, in contrast to a therapist's relationship with the patient's *parents:* "Dr. Cohen's professional relationship with Nicole [her patient] simply does not create the type of relationship between Dr. Cohen and Nicole's parents to support the imposition of a duty of care. Thus, the therapeutic relationship between Dr. Cohen and Nicole created professional obligations and legal duties that related exclusively to her patient, Nicole." 562 Pa. at 554, 756 A.2d at 1169–70. Moreover, this Court when faced with a far less substantial relationship, has found this prong to weigh in favor of a duty. *See, e.g., Sharpe v. St. Luke's Hosp.*, 573 Pa. 90, 96–97, 821 A.2d 1215, 1219 (2003) (finding a duty on part of hospital, which was under contract with employer regarding collection and handling of urine specimens as part of employer drug testing program, to employee undergoing drug testing, despite relationship factor between hospital and employee was neither professional nor contractual, and collecting cases regarding same).

Based upon the close relationship at issue and our prior precedent, finding this factor weighs in favor of a duty should be without controversy. Yet, contrary to our prior precedent and foundational authority, the majority comes to the remarkable conclusion that even the physician-patient relationship fails to support finding a duty of care. Rather than analyzing the relationship between the parties, the majority instead amends the factor to focus on the type of care provided. Specifically, the majority asserts that, because "it is increasingly common for primary or general care physicians to advise patients on relatively common matters of emotional or mental import, like stress or depression, and also to prescribe widely-used medications for such conditions," and because there is a "qualitative difference" between treatments by a general practitioner and a "dedicated course of therapy provided by a

mental health professional," this somehow changes the nature of the relationship of the parties. Majority Opinion at 333, 52 A.3d at 1275.

First, to be clear, the majority today finds that the physician-patient relationship, one of the closest recognized in our law, and one so regarded that it enjoys evidentiary privileges,[7] does not necessarily qualify as the type of relationship considered under *Althaus* to give rise to a duty of care. Rather, in the majority's view, it is the regularity and type of treatment rendered that defines the relationship. Second, the asserted "qualitative difference" in the treatment rendered by a general practitioner as compared to a mental health professional regarding any given malady suffered by a patient, or specifically the depression suffered by Mrs. Thierfelder in this matter, is rank speculation. As noted below, a general practitioner is licensed to provide mental health and psychiatric services, and, thus, the difference in treatment is immaterial to the analysis. Moreover, while the majority characterizes depression as "common matters of emotional or mental import" and suggests such conditions are treated by "widely-used medications," Majority Opinion at 334, 52 A.3d at 1275, it fails to tie its analysis to the particular averments made in the complaint before us. Mrs. Thierfelder has averred that she was suffering from depression, a mental health disorder, when being treated by Dr. Wolfert, and that he provided medications for her condition. There is no indication whether the type of depression from which she suffered was "common" or complex or severe. At this stage in the proceedings, it is unknown whether or not the medications Dr. Wolfert prescribed to his patient for her mental health disorders were "widely used."

The majority asserts the relationship analysis is different when considering treatment by a general practitioner and a mental health professional, offering this "is particularly so because a general practitioner is less likely than a mental health professional to recognize, understand, and employ transference as a conscious therapeutic method." *Id.* The majority provides no basis for this broad conclusion. Moreover, and importantly, we are at the preliminary objection

7. 42 Pa.C.S.A. § 5929; Pa.R.E. 501.

stage, and Mrs. Thierfelder pleads indicia of transference, and Dr. Wolfert's mishandling thereof. Thus, the majority's reliance upon qualitative differences in treatment is not only divorced from the complaint, but, again, is in tension with the current state of the law where a general practitioner is licensed to provide mental health or psychiatric services. Consequently, any suggestion that general practitioners are limited in the type of care they can provide, or that they cannot provide a "dedicated course of therapy," akin to that of a mental health professional, is simply without foundation.

Even assuming, *arguendo*, there are differences in treatment, this does not change the essential relationship between the parties—that of a physician in a position of superiority over a patient, and one based upon trust and confidence. Unlike the relationship between a physician and a third party, where we have found against recognizing a duty, *see Althaus,* here, there exists a close relationship between a physician who is providing treatment for a mental health disorder and a patient, a relationship founded upon trust and confidence, which strongly weighs in favor of recognizing a duty of care. In sum, not only does the majority improperly alter the focus of this prong of the *Althaus* test, it comes to the remarkable conclusion that the physician-patient relationship, one of the most private and confidential recognized in our law, does not counsel towards finding a duty of care.

**Social Utility of Physician's Conduct**—While it is axiomatic that medical professionals contribute greatly to our society by providing care to those in need, the relevant inquiry regarding social utility is specific to the conduct in question. *See, e.g., Lindstrom v. City of Corry,* 563 Pa. 579, 585, 763 A.2d 394, 397 (2000) (analyzing social utility factor not based upon value of police work universally, but on utility of police officer's attempt to apprehend a fleeing suspect); *Forster v. Manchester,* 410 Pa. 192, 197, 189 A.2d 147, 150 (1963) (cited in *Althaus* as foundation for social utility factor, focusing on specific type of investigation conducted by private detective, not social utility of private detectives in general). Thus, while the majority shifts the focus, the relevant and precise inquiry

*sub judice* involves the social utility of a physician having sexual relations with a patient while rendering treatment for mental health disorders.

In Pennsylvania, sexual contact between physicians and patients is deemed to be unprofessional, and it is expressly prohibited by the State Board of Medicine; violation of this prohibition subjects a physician to disciplinary action including the loss of his or her license. 49 Pa.Code §§ 16.61, 16.110. Importantly, this prohibition is reserved not only for mental health professionals, but rather applies to all medical practitioners. According to the profession's ethical code, sexual relations between physician and patient "detract from the goals of the physician-patient relationship, may exploit the vulnerability of the patient, may obscure the physician's objective judgment concerning the patient's health care, and ultimately may be detrimental to the patient's well-being." American Medical Association Code of Medical Ethics § 8.14 ("Sexual Misconduct in the Practice of Medicine"). This is powerful, if not dispositive, evidence that the utilitarian value of a general practitioner having sexual relations with a patient, for whom he is providing mental health treatment, is minimal, if not non-existent. Thus, based upon the universal condemnation of sexual contact between a physician and a patient, in my view, the social utility of the physician's conduct at issue favors recognizing a duty of care.

While recognizing that sexual activity between a general practitioner and a patient has no social utility "in and of itself," Majority Opinion at 335, 52 A.3d at 1275, the majority attempts to address the obvious lack of social utility by again altering the proper focus of this prong, and recasts the analysis in terms of ready access to treatment. The majority offers that there is social utility in *not prohibiting* a physician from having sexual relations with a patient the physician is treating for mental health disorders, as, according to the majority, such a prohibition on a physician's sexual contact with his patient "burdens the social utility in general practitioners serving as first-stop medical providers for a litany of maladies, including mental and emotional issues that may not

be so severe as to require a mental health specialist." Majority Opinion at 335, 52 A.3d at 1276. The majority fails to explain how this is so, especially in light of the pre-existing duty on a physician to refrain from such conduct by the State Board of Medicine. The majority further concludes that this is a "difficult balance" not particularly amenable for our common law consideration. *Id.*

In my view, it is difficult, if not impossible, to reconcile the majority's concern with "burden[ing]" these front line caregivers with the fact that, as noted above, sexual contact between physicians and patients is universally condemned, is deemed to be unprofessional, and is already expressly prohibited by the medical profession. Indeed, noticeably absent from the majority's analysis of any of the *Althaus* factors is mention of this blanket prohibition. The struggle the majority faces is that, in analogous matters, our Court has had to analyze equally valuable but competing kinds of conduct in deciding whether to impose a duty. *See, e.g., Emerich v. Phila. Ctr. for Human Dev., Inc.,* 554 Pa. 209, 720 A.2d 1032 (1998) (weighing warning of third party against threat of immediate risk of serious harm or death against confidentiality of communications with patient). By contrast, here, we are considering conduct which is universally condemned and proscribed by state regulation. There is little or no social utility in a physician having a sexual relationship with a patient for whom he is providing mental health treatment, and the "burdening" of the providing of care is a dubious proposition at best. Thus, in my view, this factor plainly weighs in favor of finding a duty.

Indeed, while the majority suggests the analysis is far more "nuanced" than this approach allows, distilled to its essence, the majority's analysis of this factor rests upon the assumption, if believed, that if general practitioners have a duty not to engage in sexual contact with their patients, it will burden their providing treatment for mental health disorders. I believe this conclusion strains credulity, especially in light of the already existing prohibition on this conduct. Respectfully, in this matter, the analysis is much less complex and nuanced than the majority purports.

**Nature of the Risk and Foreseeability of the Harm**—In my view, there is a significant risk that a physician, holding a superior position over a patient suffering from a mental health disorder such as depression, who engages in a sexual relationship with that patient, does so to the detriment of his charge. Obviously, one who suffers from a mental health disorder such as depression, and who engages in a sexual relationship while being treated for such malady, may suffer substantial harm. In this matter, Mrs. Thierfelder has pled such harm. Moreover, under *Althaus,* we look to see if the defendant created the harm or foresaw the possibility of the harm. *Althaus,* 562 Pa. at 554, 756 A.2d at 1170. While merely allegations at this point, it is clear that, if proved to be true, Dr. Wolford "created" the harm that was suffered by Mrs. Thierfelder.

While acknowledging that risk, as well as the harm that may ensue if a mental health professional exploits the physician/patient relationship, the majority nevertheless finds the harm is not foreseeable when a *general practitioner* engages in sexual relations with a patient he is treating for mental health disorders: according to the majority, a general practitioner "unfamiliar with transference, or less familiar with the effects of the treatment, or who is not deliberately employing the technique . . ., is less likely to foresee that an apparently consensual sexual affair with the patient may risk worsening the patient's psychological problems and even create new doubts, anxieties, and agitations." Majority Opinion at 336–37, 52 A.3d at 1276. Thus, the majority apparently believes that such negative outcomes are simply too unforeseeable for the general practitioner, and, accordingly, finds it unreasonable to place a legal duty on a general practitioner to abstain from sexual relations with a patient who is suffering from a mental health disorder. I cannot agree. The possibility and import of harm concerning transference has been known for decades, *see, e.g., Simmons v. U.S.,* 805 F.2d 1363, 1364–65 (9th Cir.1986), yet the majority gives general practitioners a pass on knowing and understanding the possible ramifications and injury that could occur from their undertaking treatment of mental health disorders of their patients. Furthermore, the

American Medical Association explains generally the potential for harm in giving its rationale for its prohibition on physician-patient sexual relationships: such relationships "exploit the vulnerability of the patient, may obscure the physician's objective judgment concerning the patient's health care, and ultimately may be detrimental to the patient's well-being." American Medical Association Code of Medical Ethics § 8.14.

Moreover, the majority's analysis is undermined by the fact that, in Pennsylvania, a general practitioner is licensed to practice mental health or psychiatric services, and to diagnose and provide psychiatric treatment, all without any residency or board certification in psychiatry or psychology. *See* Pennsylvania Medical Practice Act of 1985, 63 P.S. §§ 422.1–422.51a. In my view, when a general practitioner undertakes to render treatment to a patient for mental health disorders, which the physician is legally permitted to provide, it is not unreasonable for that physician to understand and know the basic consequences of such care.

While, as noted above, social utility is set forth as a discrete factor, and is properly analyzed as such, we also weigh the social utility of the conduct at issue against the factor concerning the nature of the risk and foreseeability of harm.[8] Considering the minimal or utter lack of social utility of a physician having sexual relations with a patient while rendering mental health treatment, and the nature of the risk of harm and its possible foreseeability, these factors, viewed both individually and when considered collectively, weigh in favor of recognizing a legal duty of general practitioners to refrain from engaging in sexual relations with their patients whom they are treating for mental health disorders.

**8.** *See Lindstrom, supra,* where each discrete factor, including social utility was applied separately. Additionally, in *Althaus,* we considered social utility of a physician's actions as a discrete factor and then also weighed this factor against risk and foreseeability: "[h]ere, the social utility disfavors expanding therapist's duty of care to non-patients, especially where the non-patients are the accused victimizers. However, we must *also* weigh this factor against the potential risk and foreseeability of harm stemming from improper treatment of children who have been sexually abused." 562 Pa. at 554, 756 A.2d at 1170 (emphasis added).

**Consequences of Imposing a Duty on Physicians**—As to the consequence of imposing a duty upon general practitioners to refrain from having consensual sexual relations with patients whom they are treating for mental health disorders, those physicians are in the best position to ensure that they bring no harm to their patients by refraining from such conduct, and, thus, physicians possess the ability to limit their liability by acting within already imposed state regulatory limitations with respect to their patients.

Similar to its discussion of the social utility factor, the majority offers that the duty to refrain from sexual contact with a patient would impose "significant consequences" and would "have the effect of discouraging general practitioners from rendering what appears to have become, by now, relatively routine attention to their patients' mental and emotional well-being." Majority Opinion at 337–38, 52 A.3d at 1277. Yet, the majority fails to explain why this is so. In addition to its contention that imposing upon physicians such a duty will be too burdensome, the majority offers that "free will and personal responsibility hold some sway." *Id.*[9] Ultimately, the majority believes that requiring physicians to refrain from sexual relations with such patients will negatively impact the doctor-patient relationship and general practitioners will cease to provide medical care for mental health maladies. *Id.* Essentially, the majority contends that, if a general practitioner is not free of the specter of professional liability for having sex with his patient who is in need of mental health treatment, he will not provide such care.

As discussed above, the difficulty with the majority's analysis is that its claimed chilling effect on a general practitioner's patient care is unsupported and dubious. In my view, the consequences of placing a duty on a physician who is render-

9. The majority repeatedly downplays the care provided by a general practitioner to a patient who suffers from a mental health disorder as "base-level" and "relatively routine" and suggests patients seek help from mental health professionals for only "serious mental and emotions problems." However, as noted above, a general practitioner is licensed to provide mental health and psychiatric services in Pennsylvania, and, at this stage, we simply do not know the type or level of care that Dr. Wolfert provided while treating Mrs. Thierfelder for depression.

ing treatment for a mental health disorder to refrain from having sexual contact with his patient are not onerous, and I am unpersuaded that such a prohibition will discourage physicians from rendering appropriate mental health care, especially where physicians are highly-regarded and highly-trained professionals, and, as noted above, sexual conduct is already prohibited by the standards of the medical profession. Further, here we have a physician providing care for a mental health disorder to a vulnerable patient, and, thus, virtues of free will and personal responsibility simply do not resonate with their typical force. The parties' free will may be honored should the mutual desire for a sexual relationship prove compelling: the physician may immediately terminate the professional relationship with the patient and, at some appropriate subsequent time, engage in the sexual relationship desired; or, in the alternative, the physician may continue treating the patient but refrain from having a sexual relationship. In my view, the consequences of burdening general practitioners with a duty of care not to engage in sexual relations with patients whom they are treating for mental health problems are minimal and weigh in favor of recognizing such a duty.

**Overall Public Interest in the Proposed Solution**—Again, invoking a chilling effect on patient care, the majority concludes that placing a duty on a physician to refrain from having a sexual relationship with a patient who suffers from mental health disorders comes at a "high social cost" and would "discourage general or primary care doctors from meeting their patients' manageable mental and emotional needs." Majority Opinion at 339, 52 A.3d at 1278. Again, I find this conclusion to be inexplicable. The majority accepts that general practitioners now provide a significant degree of mental or emotional care for their patients, including the prescribing of medication; yet, to a large degree, the majority reasons that such widespread caregiving justifies not imposing a duty. The opposite is true in my view: that the health care system has changed, that the distinction between general practitioners and mental health professionals has become blurred, and

that it has become commonplace for general practitioners to treat patients for mental health disorders and to prescribe drugs to these individuals for these conditions, counsels *towards* protecting these patients, not *against* it. Insulating from liability general practitioners who decide to engage in sexual relations with their patients serves no public interest of which I am aware. Indeed, I find there to be a significant overall public benefit in recognizing a duty of general practitioners *not* to engage in sexual relations with patients suffering from mental health disorders, as such a duty will reduce the chance of injuring or exacerbating the symptoms of a patient the physician has pledged to assist, will enhance the chance of recovery, and will discourage conduct by the physician that could result in professional disciplinary action and the loss of the physician's license.

I find that faithful application and weighing of the *Althaus* factors leads to recognizing a legal duty on a general practitioner to refrain from having sexual relations with a patient whom the physician is treating for mental health disorders, and should allow this claim to proceed beyond the pleadings stage. As we have recognized, "the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered." *Althaus*, 562 Pa. at 552, 756 A.2d at 1168–69 (internal quotation marks omitted). Importantly, "the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society." *Id.* at 553, 756 A.2d at 1169. In light of our Court's understanding of the notion of duty, I have no hesitation in concluding that general practice physicians who provide treatment for mental health disorders to patients have a duty to abstain from sexual relations with their patients—conduct which is deemed to be unprofessional and prohibited by the medical community—and that these physicians may be potentially liable in professional negligence actions for any harm to their patients—patients they pledged to take no action to

harm—as a result of engaging in such conduct.[10]

Here, Mrs. Thierfelder has pled, *inter alia,* that she was in a physician-patient relationship; that Dr. Wolfert was treating her for a mental health disorder, depression; that, during this relationship, Dr. Wolfert's treatment and medication caused her to believe that he was her "hero," that he had "cured" her, and that she was in love with him; that they began a sexual relationship; that she attempted to end the relationship but that Dr. Wolfert convinced her to continue the relationship; that Dr. Wolfert failed to treat her appropriately; that Dr. Wolfert practiced therapeutic techniques beyond the scope of his competence, and failed to properly recognize, diagnose, and treat her transference; and that, as a result of this conduct, she suffered harm. In my view, these averments are sufficient to allow this cause of action in professional negligence to proceed beyond the pleading stage and continue to discovery.

Thus, for the above reasons, I would affirm the order of the Superior Court.

**10.** I view as distinct the question of whether it would be appropriate to impose a duty where a physician has sexual relations with a patient who is being treated only for a physical condition, as such sexual contact could be viewed as unrelated to the patient's treatment and physical condition. As noted above, that question is not before us in the present case.